THE INTERNATIONAL ASSOCIATION
OF INDEPENDENT TANKER OWN-
ERS (INTERTANKO), Plaintiff,

v.

Mike LOWRY, et al., Defendants.

No. C95–1096C.

United States District Court,
W.D. Washington.

Nov. 18, 1996.

Henry C. Jameson, Jameson Babbitt Stites & Lombard, Seattle, WA, C. Jonathan Benner, Eckert Seamans Cherin & Mellott, Washington, DC, for International Association of Independent Tanker Owners.

William B. Collins, Attorney General's Office, Olympia, WA, for Mike Lowry, Governor of the State of WA.

William B. Collins, Attorney General's Office, Olympia, WA, Jerri Lynn Thomas, Rebecca A. Vandergriff, Attorney General's Office, Ecology Division, Olympia, WA, for Christine O. Gregoire, Barbara J. Herman.

Randall J. Watts, Whatcom County Prosecuting Attorney's Office, Bellingham, WA, for David Maceachern.

Thomas Herrick Robertson, Tim Walter Dore, Snohomish County Prosecuting Attorney, Civil Division, Everett, WA, for James H. Krider.

Alex Golan, King County Courthouse, Civil Division, Seattle, WA, for Norman Maleng.

Jeffrey Needle, Seattle, WA, for intervenors National Resources Defense Council,

Washington Environmental Council, Ocean Advocates, Inc.

## ORDER

COUGHENOUR, District Judge.

This matter comes before the Court on cross-motions for summary judgment filed by plaintiff, defendants and intervenors. Having heard oral argument, and having reviewed the pleadings, memoranda, exhibits and other documents on file, the Court now finds and concludes as follows:

### I. Background

This is a lawsuit brought by the International Association of Independent Tanker Owners ("Intertanko") against Washington State, certain state officials, and four county prosecutors. Intertanko seeks an order declaring that certain Washington statutes and regulations pertaining to the operation of oil tankers in state waters are unconstitutional. Three environmental groups, the National Resources Defense Council, the Washington Environmental Counsel and Ocean Advocates, Inc., have intervened.

The marine waters of Washington include a rocky ocean coastline, the "inland sea" of Puget Sound, and the Straight of Juan de Fuca. These waters host ecosystems that are as rich and diverse as any in the world. These waters are also highly susceptible to damage from oil pollution. Puget Sound is particularly vulnerable because it is relatively confined and shallow. Puget Sound is also difficult to navigate due to vessel traffic, fog and natural obstructions.

Intertanko is a trade association with approximately 253 members and 152 associate members who own or operate tankers. Intertanko's members represent on a tonnage basis, approximately 80 percent of the world's independently owned tanker fleet. Intertanko members call at oil facilities in Puget Sound, and travel along the Columbia River to reach ports in Oregon.

Intertanko challenges several statutes and regulations that have been implemented by the state to prevent oil spills and thereby protect Washington waters. *See* RCW 88.46.010, *et seq.*, and WAC 317–21–010, *et*

*seq.* Intertanko specifically asserts that RCW 88.46.010(2)–(3), and RCW 88.46.040(3) are preempted or otherwise invalidated by federal law. In order to transport oil in state waters, these statutes require tank vessel operators to file oil spill prevention plans. These plans must provide for the best achievable protection from damages caused by the discharge of oil, and must comply with regulations adopted by the State Office of Marine Safety ("OMS").

Intertanko also asserts that 16 regulations promulgated by the OMS are invalid. These regulations lay out specific requirements that tanker vessel operators must satisfy to meet the best achievable protection standards in their prevention plans. These regulations may be summarized as follows:

1. Event Reporting—WAC 317–21–130. Requires operators to report all events such as collisions, allisions and near-miss incidents for the five years preceding filing of a prevention plan, and all events that occur thereafter for tankers that operate in Puget Sound.

2. Operating Procedures—Watch Practices—WAC 317–21–130. Requires tankers to employ specific watch and lookout practices while navigating and when at anchor, and requires a bridge resource management system that is the "standard practice throughout the owner's or operator's fleet," and which organizes responsibilities and coordinates communication between members of the bridge.

3. Operating Procedures—Navigation— WAC 317–21–205. Requires tankers in navigation in state waters to record positions every fifteen minutes, to write a comprehensive voyage plan before entering state waters, and to make frequent compass checks while under way.

4. Operating Procedures—Engineering— WAC 317–21–210. Requires tankers in state waters to follow specified engineering and monitoring practices.

5. Operating Procedures—Prearrival Tests and Inspections—WAC 317–21–215. Requires tankers to undergo a number of tests and inspections of engineering, navigation and propulsion systems twelve

hours or less before entering or getting underway in state waters.

6. Operating Procedures—Emergency Procedures—WAC 317–21–220. Requires tanker masters to post written crew assignments and procedures for a number of shipboard emergencies.

7. Operating Procedures—Events—WAC 317–21–225. Requires that when an event transpires in state waters, such as a collision, allision or near-miss incident, the operator is prohibited from erasing, discarding or altering the position plotting records and the comprehensive written voyage plan.

8. Personnel Policies—Training—WAC 317–21–230. Requires operators to provide a comprehensive training program for personnel that goes beyond that necessary to obtain a license or merchant marine document, and which includes instructions on a number of specific procedures.

9. Personnel Policies—Illicit Drugs and Alcohol Use—WAC 317–21–235. Requires drug and alcohol testing and reporting.

10. Personnel Policies—Personnel Evaluation—WAC 317–21–240. Requires operators to monitor the fitness for duty of crew members, and requires operators to at least annually provide a job performance and safety evaluation for all crew members on vessels covered by a prevention plan who serve for more than six months in a year.

11. Personnel Policies—Work Hours—WAC 317–21–245. Sets limitations on the number of hours crew members may work.

12. Personnel Policies—Language—WAC 317–21–250. Requires all licensed deck officers and the vessel master to be proficient in English and to speak a language understood by subordinate officers and unlicensed crew. Also requires all written instruction to be printed in a language understood by the licensed officers and unlicensed crew.

13. Personnel Policies—Record Keeping—WAC 317–21–255. Requires operators to maintain training records for crew members assigned to vessels covered by a prevention plan.

14. Management—WAC 317–21–260. Requires operators to implement management practices that demonstrate active monitoring of vessel operations and maintenance, personnel training, development and fitness, and technological improvements in navigation.

15. Technology—WAC 317–21–265. Requires tankers to be equipped with global positioning system receivers, two separate radar systems, and an emergency towing system.

16. Advance Notice of Entry and Safety Reports—WAC 317–21–540. Requires at least twenty-four hours notice prior to entry of a tanker into state waters, and requires that the notice report any conditions that pose a hazard to the vessel or the marine environment.

Intertanko relies on a number of federal statutes, regulations and international treaty obligations to assert that the state statutes and regulations improperly intrude into a field controlled by the federal government. Most of the federal law relied on by Intertanko is derived from the Tank Vessel Act of 1936, the Ports and Waterways Safety Act of 1972 ("PWSA"), the Port and Tanker Safety Act of 1978 ("PTSA")[1], and the Oil Pollution Act of 1990 ("OPA 90")[2]. The progressive passage of these acts by Congress either added to or amended prior law regarding the regulation of oil tankers. The provisions of these acts are largely found in Titles 33 and 46 of the United States Code. These laws impose specific requirements for tankers or delegate to the Coast Guard the responsibility for promulgating specific standards.

 Intertanko also relies on a handful of treaties to which the United States has acceded. These include the International Convention for the Safety of Life at Sea, 1974 ("SOLAS"), the International Convention for the Prevention of Pollution from Ships, 1973, and the Protocol of 1978 ("MARPOL"), the International Convention on Standards of Training, Certification, and

---

**1.** These two acts are often referred to together as the "PWSA/PTSA."

**2.** Pub.L. No. 101–380, 104 Stat. 486 (August 18, 1990).

Watchkeeping for Seafarers, 1978 ("STCW"), and the International Regulation for Preventing Collisions at Sea, 1973 ("COLREGS"). These treaties have all been signed and ratified by the United States.[3]

## II. Discussion

This case tests the extent to which Washington State may protect its marine environment by regulating oil tankers in the areas of operations, personnel, management, technology and information reporting. Although protection of the marine environment has historically been within the reach of the police powers of the states, shipping has traditionally been governed by federal law. Thus the Washington oil spill prevention statutes and regulations overlap requirements imposed by the federal government. This overlap creates a tension between the power of the state and the power of the federal government.

Intertanko seeks to resolve this tension. Intertanko argues that the Washington oil spill prevention statutes and regulations are preempted by federal statutes and regulations, and by federal treaty obligations through the Supremacy Clause of the United States Constitution. It also argues that the oil prevention statutes and regulations violate the Foreign Affairs Clause of the Constitution and the Commerce Clause of the Constitution. In addition, it asserts that the regulations are invalid because they reach beyond the three mile territorial limit of the navigable waters of Washington State.

Intertanko moves for summary judgment and asks the Court to enjoin the enforcement of the oil spill prevention laws. Defendants and intervenors move for summary judgment dismissing Intertanko's complaint. Because the resolution of this case depends almost exclusively on questions of law, there are no genuine issues of material fact and Intertanko's claims may be fully litigated on summary judgment. Fed.R.Civ.P. 56.

## A. Preemption.

■ "[W]hen a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). Explicit preemption is present when Congress so declares. *Id.* Implicit preemption is present if the scheme of federal regulation is so pervasive as to indicate that Congress left no room for state action. *Id.* It may also be inferred when "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

■ In those cases where Congress has not totally foreclosed state regulation, a state statute is preempted if it conflicts with a federal statute. *Ray*, 435 U.S. at 158, 98 S.Ct. at 994. "A conflict will be found 'where compliance with both federal and state regulations is a physical impossibility ...,' or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

**3.** A treaty cannot, however, have any impact on domestic laws unless it is self-executing, or unless its terms are enacted as parts of statutes or administrative regulations. *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1283 (9th Cir.1985). There are at least four relevant factors to be considered when determining whether a treaty is self-executing: "(1) 'the purposes of the treaty and the objectives of its creators,' (2) 'the existence of domestic procedures and institutions appropriate for direct implementation,' (3) 'the availability and feasibility of alternative enforcement methods,' and (4) 'the immediate and long range social consequences of self- or non-self-execution.'" *Id.* (quoting *People of Saipan v. United States Department of Interior*, 502 F.2d 90, 97 (9th Cir.1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975)). Intertanko has not addressed these four factors in asserting that the treaties it relies upon are self-executing. Intertanko has, however, identified where these treaties have been implemented by federal statute and regulation.

■ Express and implied preemption do not require that state and federal rules conflict. A state rule may be preempted under these theories when it is different than the federal rule. The state and federal rule must, however, be at odds for conflict preemption to apply.

### 1. *Oil Pollution Act of 1990.*

As an initial matter, defendants and intervenors assert that OPA 90 expressly prohibits the preemption of state oil spill prevention laws. Congress passed OPA 90 soon after the Exxon Valdez oil spill in Prince William Sound. The Act addresses oil pollution liability, compensation, prevention and removal.

Defendants and intervenors rely on OPA 90 § 1018, which is codified at 33 U.S.C. § 2718. Section 1018 of the Act states in relevant part:

(a) PRESERVATION OF STATE AUTHORITIES; SOLID WASTE DISPOSAL ACT—Nothing in this Act ... shall—

(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A) the discharge of oil or other pollution by oil within such State; or

(B) any removal activities in connection with such a discharge;

\* \* \* \* \* \*

(c) ADDITIONAL REQUIREMENTS AND LIABILITIES, PENALTIES— Nothing in this Act ... shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—

(1) to impose additional liability or additional requirements; or

(2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;

relating to the discharge, or substantial threat of a discharge, of oil.

■ Defendants and intervenors claim that this language recognizes the right of states to impose additional requirements to prevent oil spills. The starting point for statutory interpretation is consideration of the language employed by Congress, and consideration of the statute as a whole, including its history and purposes. *United States v. van den Berg,* 5 F.3d 439, 442 (9th Cir.1993).

■ The language of section 1018 is best understood when the Act as a whole is considered. Section 1018 of OPA 90 is located in "Title I—Oil Pollution Liability and Compensation." Title I of OPA 90 sets the standards for liability and damages for the discharge of oil or the substantial threat of discharge of oil into the navigable waters of the United States. The Act also includes "Title IV—Prevention and Removal." This title sets standards for tanker personnel qualifications, manning, operations, design and construction. It also directs the President to prepare a National Contingency Plan for the removal of oil, and to require tank vessel operators to prepare individual response plans for the removal of oil.

The language of the savings clause relied on by defendants and intervenors applies broadly to "this Act," which includes oil pollution liability, compensation, prevention and removal requirements. It makes clear that states are not preempted from adding additional "requirements with respect to ... the discharge of oil," or "relating to the discharge ... of oil." Because the Act comprehensively addresses oil discharge liability, compensation, prevention and removal, all provisions of the Act must be "with respect to" or "relating to" the discharge of oil. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) (a law relates to a subject when it has a connection with or reference to that subject). Pursuant to the broad language of section 1018, it follows that none of the provisions of OPA 90 preempt the ability of the states to add to federal requirements in the areas addressed by the Act.

Intertanko's assertion that the savings clause is limited to liability, compensation, and removal, but not prevention, is not supported by the broad language employed in section 1018. Moreover, Intertanko's asser-

tion that the nonpreemption language is limited in its application by its placement in Title I is refuted by the explicit allowance in section 1018 for additional state regulation of "removal activities." Removal activities are regulated not in Title I, but in Title IV along with prevention standards. Thus the savings clause cannot be limited to Title I, but must also include Title IV.

In addition, Intertanko's assertion that applying the savings clause to the prevention requirements would run afoul of international standards is undermined by other provisions in the Act. Foremost is the requirement that oil tankers have double hulls. 46 U.S.C. § 3703a. This contradicts the international standards imposed by Regulation 13F to Annex I of MARPOL, and demonstrates that Congress was not overly concerned with maintaining uniformity with such standards. In addition, the Act clearly states that it is in the best interests of the United States to participate in a international regime "that is at least as effective as Federal and State laws in preventing incidents ..." OPA 90 § 3001.[4] This anticipates that federal and state laws may be more effective than international standards.

The application of the savings clause to prevention regulations is also supported by the legislative history of OPA 90. The Conference Report on the final version of OPA 90 explains the preemptory effect of the Act:

Thus, subsection (a) of section 1018 of the substitute states explicitly that nothing in the substitute [bill] ... shall affect in any way *the authority of the State or local government to impose additional liability or other requirements with respect to oil pollution or to the discharge of oil within the State or with respect to any removal activities in connection with such discharge.*

H.R.Conf.Rep.No. 101–653, 101st Cong., 1st Sess., p. 121 (1990), *reprinted in* 1990 U.S.C.C.A.N. 800 (emphasis added). This language reemphasizes that the Act broadly saves to states the ability to impose additional "requirements with respect to oil pollution." [5]

The impact of the savings clause on prevention standards is further highlighted by a letter to the Coast Guard Commandant from the Washington State Congressional Delegation dated September 28, 1993. That letter concerned the application of Washington's regulations to vessels passing through state waters to reach Canada. The delegation said "[w]e are extremely concerned with the Coast Guard's threats to void state oil prevention standards for these Canada-bound vessels. In the Oil Pollution Act of 1990 Congress provided that state laws, requirements and jurisdiction would not be preempted by federal law. The U.S. Coast Guard should not be obstructing the state's efforts to protect state waters."

The only other court to address the nonpreemption language of OPA 90 also concluded that the Act saved to states the ability to impose additional requirements with regard to all aspects of oil pollution liability, compensation, prevention and removal. In *Berman Enterprises, Inc. v. Jorling*, 793 F.Supp. 408, 414–16 (E.D.N.Y.1992), *aff'd*, 3 F.3d 602 (2nd Cir.1993), *cert. denied*, 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994), the court examined a New York statute that required vessels to obtain a state license that among other things necessitated a showing that the vessel " 'can provide necessary equipment to prevent, contain and remove discharges of petroleum.' " *Id.* at 411 (citing New York Navigation Law § 174(3)). The Court concluded that the OPA 90 savings clause made clear that the

---

4. Although this statement relates only to liability and removal regimes, it supports the view that Congress did not intend the provisions of OPA 90 to be limited by international standards.

5. The Conference Report also stated that OPA 90 "does not disturb the Supreme Court's decision in *Ray v. Atlantic Richfield Company*, 435 U.S. 151, [98 S.Ct. 988, 55 L.Ed.2d 179] (1978)." The citation to *Ray* may mean that there was an

intention not to eradicate the Court's holding that federal law impliedly preempted state tanker design and construction regulations. *Ray*, 435 U.S. at 163–64, 98 S.Ct. at 997–98. That would not create an issue in this case because none of the Washington regulations control design and construction. Moreover, if there is a conflict between a statute and legislative history, the statute prevails. *In re the Matter of Sinclair*, 870 F.2d 1340, 1344 (7th Cir.1989).

New York statute was not preempted. It concluded that the statute was actually an acceptance of "the federal government's invitation to provide additional means of enforcing the federal policy favoring clean water." *Id.* at 416.

In similar fashion, upon a review of the language, structure and legislative history of the Act, the Court concludes that OPA 90's express nonpreemption language applies to the Washington State regulations, which govern tanker operations, personnel, management, technology and information reporting. These regulations cover much of the same ground addressed by the prevention provisions of OPA 90, which set standards for tanker personnel qualifications, manning, operations, design and construction. The Act made clear that Congress places a high priority on reducing the threat of oil pollution, and that states may impose additional requirements to meet these goals.

### 2. *Implied Field Preemption.*

Intertanko's assertion that a majority of the challenged regulations are invalid under the theory of implied field preemption is largely foreclosed by the nonpreemption language of OPA 90. Implied field preemption is present if the scheme of federal regulation is so pervasive as to indicate that Congress left no room for state action, or if the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Ray,* 435 U.S. at 157, 98 S.Ct. at 994.

Intertanko primarily asserts that the comprehensive regulation of oil tankers by the Federal government leaves no room for state regulation, which is thus preempted. There can be no doubt that the areas addressed by the Washington oil spill prevention rules, which generally cover tanker operations, personnel, management, technology and information reporting, are also comprehensively regulated by federal statutes, regulations and treaty obligations. Comprehensive regulation of an area alone, however, is not enough to infer preemption. *Hillsbor-*

*ough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 716–18, 105 S.Ct. 2371, 2376–78, 85 L.Ed.2d 714 (1985). There must be some additional showing that Congress intended the comprehensive nature of the regulation to foreclose state action.

In *Ray* the Supreme Court held that Congress impliedly occupied the field in the area of tanker design and construction. Among other things, the Court examined a Washington statute that required all oil tankers entering state waters to have certain standard safety features, including a minimum amount of horsepower, twin screws, and double hulls. *Ray,* 435 U.S. at 160, 98 S.Ct. at 995–96. The Court found that these state law requirements were impliedly preempted under the regime imposed by Title II of the PWSA.[6] It specifically examined 46 U.S.C. § 391a (1970 Ed., Supp. V), the provisions of which are now largely codified at 46 U.S.C. § 3703. With language similar to the current statute, the former version of section 3703 required the Coast Guard to issue regulations regarding the "design, construction, and operation" of tankers in order to protect "life, property, and the marine environment from harm." *Ray,* 435 U.S. at 161, 98 S.Ct. at 996.

Based on this statutory scheme the Court concluded that "Congress, insofar as design characteristics are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States." *Id.* at 163, 98 S.Ct. at 997. As a result, "Congress intended uniform national standards for design and construction of tankers that would foreclose the imposition of different or more stringent state requirements." *Id.* at 163–64, 98 S.Ct. at 997.

The Court also noted that states have more latitude outside the area of tanker design and construction. "Of course, that a tanker is certified under federal law as a safe vessel insofar as its design and construction characteristics are concerned does not mean

---

6. Title I is now codified as amended in 33 U.S.C. §§ 1221–1232, and Title II is now codified as

amended at 46 U.S.C. §§ 3701–3718.

that it is free to ignore otherwise valid state or federal rules or regulations that do not constitute design or construction specifications." *Id.* at 168–69, 98 S.Ct. at 1000.

In this regard, the *Ray* Court addressed the impact of Title I of the PWSA on a Washington State regulation that required tug escorts for tankers over 40,000 DWT when certain design requirements were not met. The Court noted that Title I of the PWSA provided that the Coast Guard "may" promulgate vessel operating requirements, which could impose certain vessel traffic services and systems, could require equipment necessary to follow these services and systems, could control vessel traffic by among other things specifying size and speed limitations, and could restrict vessel operations to those having the particular operating characteristics that are necessary for safety. *Id.* at 169–70, 98 S.Ct. at 1000. This authorization for Coast Guard action was codified at 33 U.S.C. § 1221 (1970 ed., Supp. V), and is currently located in large part at 33 U.S.C. § 1223.

The Court concluded that a tug escort provision was not a design requirement that would be subject to implied field preemption, but was instead an operating rule "arising from the peculiarities of local waters that call for special precautionary measures." *Id.* at 171, 98 S.Ct. at 1001. Because with regard to operating rules, the PWSA authorized but did not require the Coast Guard to issue controlling regulations, the Court found no implied field preemption. *Id.* It also concluded that because the Coast Guard had not promulgated tug escort provisions for Puget Sound, there was no conflict between the state rule and federal law. *Id.* at 172, 98 S.Ct. at 1001–02.[7]

The Ninth Circuit has also examined the preemptive effect of federal shipping regulations. In *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985), the court examined an Alaska statute that prohibited oil tankers from discharging ballast water that had been stored in oil tanker holds. Instead, the state statute required tankers to discharge such ballast water into on-shore processing facilities. Chevron claimed that the statute was preempted by title II of the PWSA/PTSA, which required the Coast Guard to issue regulations concerning deballasting. That authority exists today under 46 U.S.C. § 3703(a)(7).[8] The Coast Guard regulations concerning deballasting were less stringent than the Alaska statute.

The Ninth Circuit held that the federal statute and regulatory scheme did not impliedly preempt the state regulation concerning deballasting. *Id.* at 495. In reaching this decision, the court distinguished between the federal regulation of vessel "design characteristics," which were found to preempt state law in *Ray,* and the federal regulation of "pollutant discharges." *Hammond,* 726 F.2d at 488. It noted that the Supreme Court in *Ray* concluded that " 'ship design and construction standards are matters for national attention,' " but that "[t]he subject matter of environmental regulation, on the other hand, has long been regarded by the Court as particularly suited to local regulation." *Id.* (quoting *Ray,* 435 U.S. at 166 n. 15, 98 S.Ct. at 998 n. 15). The Ninth Circuit classified the Alaska statute concerning the disposal of ballast water as an environmental regulation limiting the discharge of pollutants from tankers. *Id.* It concluded that while the statute was not subject to implied field pre-

---

7. The *Ray* Court also made clear that certain environmental laws were not preempted by federal shipping laws and regulations. It explained that states can still require federally certified vessels to conform to " 'reasonable, nondiscriminatory conservation and environmental protection measures' " *Id.* (quoting *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 277, 97 S.Ct. 1740, 1748, 52 L.Ed.2d 304 (1977)); *see also Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 343, 93 S.Ct. 1590, 1601, 36

L.Ed.2d 280 (1973) ("sea-to-shore pollution [has been] historically within the reach of the police power of the States").

8. It should be noted that section 3703(a)(7) is the successor to the statute that required the Coast Guard to promulgate regulations for the design and construction of tankers in *Ray,* which requirements were found to preempt Washington law. Thus a regulation mandated by 46 U.S.C. § 3703 does not automatically preempt state law.

emption, it could be, but was not, subject to conflict preemption. *Id.* at 495, 501.

The Ninth Circuit also addressed the degree to which federal shipping regulations preempted state law in *Beveridge v. Lewis,* 939 F.2d 859 (9th Cir.1991). At issue there was a municipal ordinance regulating moorage and anchorage in Santa Barbara Harbor. The court concluded that while the Coast Guard had extensive authority to regulate the anchoring, mooring and movement of vessels under 33 U.S.C. § 1223, that was not enough to create implied preemption. It explained:

> Just as *Ray* refused to find implicit preemption and proceeded to discuss the *actual* conflicts between Washington's Tanker Law and federal regulations, we cannot hold that the PWSA occupies the entire field of regulation of anchorage and mooring. We cannot distinguish tanker (*Ray* ) and pollution (*Chevron* ) regulations from mooring restrictions. If both the Supreme Court and this circuit did not find Congress to have intended to preempt all local regulation by the PWSA in those areas, it is difficult to conceive how it could be found here.

*Id.* at 863. Moreover, the Court recognized that there is "congressional intent that 'there be joint federal/state regulation of ocean waters within three miles of shore.'" *Id.* at 864 (quoting *Chevron,* 726 F.2d at 489). The Court went on to find that there was no actual conflict between the municipal ordinance and federal law. *Id.* at 864–65.

▮▮▮▮ From *Ray* and its progeny two levels of preemption for statutes and regulations like those at issue here may be distilled. These categories depend on the subject matter that is being regulated. State regulation of oil tanker design and construction is impli-

edly preempted by federal law. *Ray,* 435 U.S. at 163–64, 98 S.Ct. at 997–98. State regulation of tanker operations "arising from the peculiarities of local waters that call for special precautionary measures" is not subject to implied field preemption, but may not actually conflict with federal regulation. *Ray,* 435 U.S. at 171, 98 S.Ct. at 1001. State regulation of water pollution is also not subject to implied field preemption, but may not actually conflict with federal regulation. *Chevron,* 726 F.2d at 495.

▮▮▮ Here, the Washington regulations govern vessel operations in order "to protect the state's natural resources and waters ..." RCW 88.46.010. To do so standards are imposed in the areas of tanker operations, personnel, management, technology and information reporting. These areas are much more akin to the operational tug escort provisions upheld in *Ray,* than to the design and construction requirements that were struck down in that case.[9] The state regulations arise "from the peculiarities of local waters that call for special precautionary measures." *Ray,* 435 U.S. at 171, 98 S.Ct. at 1001.

▮▮▮ Moreover, these standards are intended to protect the environment, and thus are an exercise of the state's police powers. When vessels are involved, however, there is an unavoidable overlap between state and federal regulation. But when the concern is pollution, the Ninth Circuit has recognized the need for "joint federal/state regulation of ocean waters within three miles of shore." *Chevron,* 726 F.2d at 489. This partnership was further verified by the nonpreemption clause of OPA 90. As such, the Court cannot conclude that the Washington oil spill prevention statutes and regulations are impliedly preempted.[10]

**9.** A portion of the state statute struck down in *Ray* did include radar and navigational position locating systems. *Ray,* 435 U.S. at 160, 98 S.Ct. at 995–96. Such requirements are more aptly included as regulations under Title I of the PWSA/PTSA, 33 U.S.C. § 1223, which provides that the Coast Guard may establish vessel traffic services in navigable waters of the United States, and in doing so "may require vessels to install and use specified navigation equipment, communications equipment, electronic relative motion analyzer equipment, or any electronic or other

device ..." Thus the requirements for global positioning system receivers and two separate radar systems under WAC 317–21–265 should be considered equipment necessary for vessel operating procedures under 33 U.S.C. § 1223. These requirements are not subject to implied preemption.

**10.** Intertanko also argues that implied field preemption is necessitated because of the strength of the federal interest in maritime law uniformity. *See Rice,* 331 U.S. at 230, 67 S.Ct. at 1152. This

3. *Express Preemption.*

 Intertanko hinges its claim of express preemption on several federal regulations issued by the Coast Guard, in which it is stated that the regulation is intended to preempt state law. As a general rule, "[f]ederal regulations have no less preemptive effect than federal statutes." *Fidelity Federal Savings & Loan Association v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Where Congress has directed an agency to exercise its discretion in regulating a field, the agency may issue regulations that preempt state law. *Id.* at 154, 102 S.Ct. at 3023. Such regulations may be effective so long as the agency has not exceeded the scope of its delegated authority, and has not acted in a manner that conflicts with the intent of Congress with regard to preemption as stated in the derivative statute or its legislative history. *Id.*

Intertanko alleges that one of the Washington oil spill prevention statutes, and five of the oil spill prevention regulations or subparts are expressly preempted by regulations issued by the Coast Guard.

 In this instance, however, Congress did not intend to give the Coast Guard authority to preempt state law with regard to the prevention of oil spills. The nonpreemption language of OPA 90 § 1018 prohibits the Coast Guard from doing so. *See Fidelity Federal,* 458 U.S. at 154, 102 S.Ct. at 3023.

 In the one regulatory statement where the Coast Guard attempted to reconcile OPA 90 and *Ray,* it misconstrued the law and overstated its authority to preempt. Intertanko argues that 33 C.F.R. § 155.225, which requires oil tankers to have certain emergency towing capabilities, expressly preempts WAC 317–21–265(2), which requires tankers to be equipped with an emer-

gency towing system. When it promulgated the federal rule, the Coast guard stated that:

> This rule establishes regulations requiring certain vessels to carry discharge removal equipment. In [*Ray*], the Supreme Court found that vessel design and equipment standards fall within the exclusive province of the Federal Government. The OPA 90 Conference Report explicitly says that provisions in section 1018 of OPA 90 preserving certain State authority are not meant to disturb this Supreme Court decision. Therefore, the Coast Guard intends this rule to preempt State action addressing the same subject matter.

Discharge Removal Equipment for Vessels Carrying Oil, 58 Fed.Reg. 67,995 (1993) (citation omitted). Because *Ray* required implied preemption only in the areas of tanker design and construction, and not with regard to equipment standards, the Coast Guard statement is inaccurate. Moreover, because a tow package is considered an item of discharge removal equipment, it is directly saved by the language of OPA 90 allowing states to impose additional requirements with respect to "any removal activities." OPA 90 § 1018(a)(1)(B). The Coast Guard was without authority to preempt state law with this regulation, or with the other regulations cited by Intertanko.

4. *Conflict Preemption.*

Intertanko also argues that some of the Washington regulations are in direct conflict with federal rules, and as such are preempted. Intertanko does not, however, identify any conflicts that require preemption. A state law is in conflict with and preempted by federal law (1) if compliance with both state and federal law is a physical impossibility or (2) if the state law stands as an obstacle to the accomplishment and execution of the full

---

argument is not sufficient on its own to justify a finding of implied field preemption. The Ninth Circuit has explained that "the general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." *Pacific Merchant Shipping Ass'n v. Aubry,* 918 F.2d 1409, 1422 (9th Cir.1990) (emphasis in original), *cert. denied,* 504 U.S. 979, 112

S.Ct. 2956, 119 L.Ed.2d 578 (1992). This statement recognizes that the federal interest in maritime law does not always preempt state law. Moreover, the touchstone for preemption is conflict with federal law or interference with uniformity. These tests lead back to the question of whether the federal regulation is sufficiently comprehensive in the field to prohibit conflict and to require uniformity. Moreover, any question about whether the need for uniformity creates implied preemption is foreclosed by OPA 90.

purpose and objective of Congress. *Ray*, 435 U.S. at 158, 98 S.Ct. at 994.

 Intertanko identifies eight Washington regulations that parallel new requirements that are to be imposed on February 1, 1997 pursuant to the 1995 amendments to the STCW. The new STCW requirements are being implemented by the Coast Guard through federal regulations. Intertanko asserts that there is a direct conflict because the state is requiring immediate implementation of these rules through its oil spill prevention regulations, rather than waiting until February 1, 1997. The state provisions cited by Intertanko require certain watch practices, navigation practices, training requirements for crew members, personnel evaluations, limitations on working hours, English language requirements, and management practices for the oversight of tankers. *See* WAC 317–21–200, 205(1)–(3), 230, 235, 240, 245 and 260.

First, to the extent that the Washington regulations require earlier implementation of the new STCW standards, compliance with state and federal law will not be a physical impossibility. *Ray*, 435 U.S. at 158, 98 S.Ct. at 994. Rather, early implementation will actually help operators be in compliance with the new STCW requirements when they become effective on February 1, 1997. Second, given the Congressional statement in OPA 90 as to the lack of preemption for additional, state imposed prevention requirements, the state regulations will not stand as an obstacle to the accomplishment and execution of the full purpose and objective of the new standards. *Id.* Indeed, the state regulations complement the federal goal of reducing "human error as a major cause of maritime casualties." Implementation of the 1995 Amendments to the STCW, 61 Fed.Reg. 13284 (March 26, 1996).[11]

Intertanko's emphasis on uniformity with international standards is also undercut by the Coast Guard's proposed rulemaking to implement the STCW. The Coast Guard explains that while it has tried to avoid "unnecessary additional requirements when international standards are being implemented.... In some cases, clear differences with the international scheme are retained to preserve continuity in the U.S. licensing system." 61 Fed.Reg. at 13285.

 The same analysis holds true for the two federal regulations for which Intertanko alleges an actual conflict with state rules. Intertanko says that WAC 317–21–250, which requires that all masters and licensed deck officers be able to speak English, and be able to speak a language understood by subordinate officers and unlicensed crew, conflicts with 46 U.S.C. § 8702(b), which requires that 75 percent of the crew in each department on board be able to understand any order spoken by the officers. If, however, a vessel is in compliance with the state regulation, it will necessarily be meeting the less stringent requirements of federal law. Thus dual compliance is not impossible.

 Intertanko also asserts that WAC 317–21–200(1), which requires that the navigation watch include two or three licensed deck officers, one of whom "may be a state-licensed" pilot, conflicts with 46 U.S.C. § 8502, which permits the use of federal pilots on United States tankers participating in coastwide trades. There is no conflict in this instance because the Washington regulation does not require a state-licensed pilot to be used as a lookout.[12]

**B. Commerce Clause.**

 Intertanko argues that the Washington oil spill prevention statutes and regulations unconstitutionally limit com-

---

**11.** Intertanko raises a similar complaint with regard to WAC 317–21–260(2), which requires vessel operators to have a management program, which meets the requirements of at least one of four international ship management regimes. One of these is the International Maritime Organization's International Safety Management Code ("ISM"). This code is to become mandatory for vessels operating in international trade on July 1, 1998. Intertanko alleges that the Wash-

ington regulations conflict because they require compliance prior to that date. Even if early compliance created an actual conflict, no such conflict would exist because the ISM is just one of four regimes tanker operators can follow.

**12.** As with the early implementation of the STCW standards, neither WAC 317–21–250 or 317–21–200(1) will prevent achievement of federal goals.

merce. Two types of state regulations may violate the Commerce Clause: "(1) those that directly burden interstate commerce or that discriminate against out-of-state interests and (2) those that burden interstate transactions only incidentally." *Kleenwell Biohazard Waste and General Ecology Consultants, Inc. v. Nelson,* 48 F.3d 391, 395 (9th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2580, 132 L.Ed.2d 830 (1995). Regulations in the first category are usually invalid unless the state can show that a legitimate local interest unrelated to economic protection is served and no less discriminatory alternative exists. *Id.* Those in the second category may be invalid if the challenging party can demonstrate that the incidental burdens on interstate and foreign commerce are clearly excessive in relation to the putative local benefits." *Pacific Northwest Venison Producers v. Smitch,* 20 F.3d 1008, 1012 (9th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 297, 130 L.Ed.2d 211 (1994).

■ Intertanko alleges that the Washington oil spill prevention regime directly regulates commerce because tanker traffic by definition involves the interstate or international transportation of oil. The Ninth Circuit has explained, however, that a state law does not directly regulate interstate commerce merely because it concretely affects a business engaged in interstate commerce. *Kleenwell,* 48 F.3d at 396. If that were the case, any regulation that affected interstate commerce would be forbidden. *Id.* Rather, the term is used "to refer to regulations whose *central* purpose is to regulate commerce, usually in order to benefit local interests." *Id.* (emphasis in original). The Commerce Clause does not "invalidate state regulations whose primary purpose is to address a legitimate local concern and whose incidental effect is to regulate interstate commerce." *Id.*

■ The Washington oil spill prevention rules are not impermissibly aimed at regulating commerce, or otherwise impeding interstate trade to protect state business interests. The statutes and regulations are instead intended to protect local waters from pollution.

The statutes and regulations at issue are similar to the law upheld in *Kleenwell.* There, the state required waste haulers to obtain a certificate of public convenience and necessity in order to transport and dispose of waste. *Id.* at 393. A waste hauler challenged the certificate requirement as a direct burden on its interstate hauling of waste. *Id.* at 395–96. The court concluded that the purpose of the statute was not the regulation of commerce, but was instead the legitimate local concern of ensuring the safe disposal of solid waste. *Id.* at 398. It noted that Congress by statute had "explicitly found that the field of solid waste collection is properly subject to state regulation." *Id.* Thus the Court found no direct regulation of commerce. *Id.*

In the present case oil tanker operators must file and obtain approval of an oil spill prevention plan in order to operate in state waters. RCW 88.46.040. The purpose of the requirement is to protect state waters and the marine environment, reduce the risk of a vessel casualty causing an oil spill, and to encourage procedures and technology that increase the safety of marine transportation and that protect the state's natural resources. WAC 317–21–010. To accomplish these goals the state requires operators to demonstrate through prevention plans that their oil tankers meet certain standards in the areas of tanker operations, personnel, management, technology and information reporting. In addition, Congress through the passage of OPA 90 § 1018 made clear that the states could regulate these areas in order to prevent oil spills. As in *Kleenwell,* the Washington oil spill prevention statutes and regulations do not directly regulate commerce in violation of the Commerce Clause.

■ There may still, however, be a Commerce Clause violation if "the incidental burdens on interstate and foreign commerce imposed by the Washington rules are clearly excessive in relation to the putative local benefits." *Pacific Northwest Venison Producers,* 20 F.3d at 1012. Intertanko must show that the burdens that the regulations impose on interstate commerce "clearly outweigh" the local benefits. *Kleenwell,* 48 F.3d at 399.

Intertanko has not submitted sufficient evidence to make this showing.[13] It asserts that the cost to date for a single tanker operator to develop, file and maintain an oil spill prevention plan has been about $12,000 and that the cost of installing the emergency towing package required by the rules will be about $80,000. These are relatively small amounts compared to the average operating cost of a tanker, which is between $13.6 and $19 million for U.S. flag tankers, and between $8.4 and $12 million for non-U.S. flag tankers.

The costs of implementing a plan are also quite small when compared to the cost of an oil spill. The state reports that the estimated average cost of clean-up for four major oil spills in Washington between 1984 and 1988 was $6.3 million, and that the estimated impact on natural resources for each spill ranged between $2.2 and $8.1 million.

Given the relatively minimal cost of compliance as compared to the cost of an oil spill, Intertanko cannot demonstrate that the incidental burdens on interstate and foreign commerce are clearly excessive in relation to the benefit offered by the oil spill prevention statutes and regulations. This benefit is derived from the state's promulgation of what all agree to be more stringent and protective regulations. Moreover, Because of the wide disparity in costs associated with prevention as compared to the impact of an oil spill, only a slight amount of additional protection need by achieved for the statutory scheme to have succeeded. As a result, Intertanko has not presented sufficient facts to prove an inequitable balance such that a Commerce Clause violation is present.[14]

13. Intertanko also argues that because this matter concerns international commerce, the Court must give additional scrutiny to determine whether the regulations might impair uniformity where under federal law uniformity is essential. *See Pacific Northwest Venison Producers,* 20 F.3d at 1014. Intertanko's uniformity concern is, however, misplaced. Congress through OPA 90 § 1018 has clarified that additional state oil spill prevention regulations are appropriate.

14. The Court recognizes that defendants and intervenors did not in their motions for summary judgment address the Commerce Clause claim.

## C. Foreign Affairs Clause.

Intertanko also argues that the Washington oil spill prevention rules violate the Foreign Affairs Clause of the Constitution because they allow the state to contravene important international treaty agreements, and interfere with the federal government's ability to enter into such agreements. State regulations may not impair the effective exercise of the nation's foreign policy. *Zschernig v. Miller,* 389 U.S. 429, 440, 88 S.Ct. 664, 670–71, 19 L.Ed.2d 683 (1968) (invalidating Oregon statutes that prevented foreign heirs from receiving property depending on the judgment of the state as to the propriety of the foreign country's domestic law). Thus "any state law that involves the state in the actual conduct of foreign affairs is unconstitutional." *Trojan Technologies, Inc. v. Commonwealth of Pennsylvania,* 916 F.2d 903, 913 (3rd Cir.1990), *cert. denied,* 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).

It is rare, however, that a state statute is invalidated because it intrudes into the area of foreign affairs. *Id.* ("[o]n only one occasion has the Supreme Court struck down a state statute as violative of the foreign relations power"). This is not such a case. Washington State is not acting in the federal government's place vis-a-vis a foreign or international body, but is instead exercising its police power by regulating both foreign and domestic tankers to protect the environment. Moreover, the state's decisions in this area are not keyed to any judgment as to the worthiness of a foreign regime. *See Trojan,* 916 F.2d at 903. Intertanko's Foreign Affairs Clause challenge cannot be sustained.

They did, however, argue in response to Intertanko's motion for summary judgment that the Commerce Clause claim could not be sustained. And in arguing the merits of the Commerce Clause claim, no party asserted the presence of genuine issues of material fact. As a result, the Court construes the arguments of defendants and intervenors to be akin to cross-motions for summary judgment. Moreover, settled precedent allows the entry of summary judgment to a nonmoving party. *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 313 (9th Cir.1982). The Court reaches the same conclusion with regard to Intertanko's extraterritorial claim. *See Infra,* at 1500–01.

## D. Extraterritorial Impact of Regulations.

Intertanko argues that the regulations impose obligations on tanker operators that go beyond the three-mile limit of Washington territorial waters, which is set by the Washington Constitution. Wash. Const.Art. XXIV, § 1 (setting state boundaries). It relies on *State ex rel. Luketa v. Pollock*, 136 Wash. 25, 29, 239 P. 8 (1925), which confirmed that "the jurisdiction and dominion of the state extends to the three-mile limit off shore as defined in the constitution ..."

The Washington statutes and regulations at issue by definition regulate tanker operations in Washington waters. The legislature made it unlawful for a covered vessel to operate in Washington waters without an approved prevention plan. RCW 88.46.080, .090. Owners and operators must submit prevention plans for their tank vessels. RCW 88.46.040(1). A Tank vessel, in turn, is defined as a ship that carries oil and that "[o]perates on the waters of the state." RCW 88.46.010. There is accordingly no direct assertion of jurisdiction over vessels outside of Washington waters.

Intertanko objects, however, to the incidental effects of the regulations. It objects to the requirements that owners report hazardous events even if the events occur outside of Washington, that owners use a bridge resource management system while in Washington waters that is the standard for the vessels in its fleet that operate in Washington[15], that certain crew training and drill programs be conducted, that certain personnel evaluation and record keeping requirements be administered, and that certain owner and operations management programs be followed. The Court agrees with the state, however, that while some of these activities are likely to occur outside of Washington, such occurrences are not mandated.

Moreover, the Supreme Court has upheld state police power regulations that incidentally and indirectly affect interstate or foreign commerce outside of state waters. *See Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 426, 56 S.Ct. 513, 515, 80 L.Ed. 772 (1936) (denying challenge to California law restricting the use of sardines caught outside of state waters). In addition, the Washington Supreme Court has upheld the authority of the state to prohibit the possession or transportation of salmon taken from beyond the state's three-mile limit. *Frach v. Schoettler*, 46 Wash.2d 281, 290, 280 P.2d 1038 *cert. denied*, 350 U.S. 838, 76 S.Ct. 75, 100 L.Ed. 747 (1955).[16] Although these cases deal with fisheries rather than the prevention of oil pollution, the principle remains the same. Some incidental impact on extraterritorial activities is permitted to protect state resources. Intertanko's extraterritorial challenge falls short.

## III. Conclusion

The Court concludes that the Washington oil spill prevention statutes and regulations are constitutionally valid. These statutes and regulations are not preempted by federal law, do not violate the Commerce Clause or the Foreign Affairs Clause of the Constitution, and are not improper extraterritorial restrictions. Rather, the oil spill prevention laws legitimately protect Washington's delicate and valuable marine resources through the exercise of the state's police powers.

Therefore, the motions for summary judgment filed by defendants and intervenors are GRANTED and the motion for summary judgment filed by Intertanko is DENIED. This action is hereby DISMISSED and the

---

**15.** "The bridge resource management system must be standard practice throughout the owner's or operator's fleet." WAC 317-21-200(2). " 'Fleet' means more than one tank vessel operated by the same owner or operator." WAC 317-21-060(5). "Tank vessel" means a ship that carries oil and that "[o]perates on the waters of the state." WAC 317-21-060(11). Thus application of the bridge resource management system to the "fleet" affects only those vessels that operate in Washington.

**16.** Intervenors point out that 16 U.S.C. § 1856(a)(3) now prohibits a state from "directly or indirectly regulat[ing] any fishing vessel outside its boundaries, unless the vessel is registered under the law of that State." No similar proscription has been placed on the state's ability to prevent pollution. Rather, OPA 90 has made clear that states have authority to issue oil spill prevention regulations.

Clerk of the Court is directed to enter judgment accordingly.[17]

SO ORDERED.

---

**17.** The issues raised in defendant Krider's motion for summary judgment were previously ruled on by the Court in the July 3, 1996 Order denying his motion to dismiss. Accordingly, his motion for summary judgment is DENIED. Plaintiff Intertanko's motion to supplement the summary judgment record is GRANTED.