148 F.3d 1053
 1998 A.M.C. 2113, 1998 A.M.C. 2762,
28 Envtl. L. Rep. 21,397,
98 Cal. Daily Op. Serv. 4666,
98 Daily Journal D.A.R. 6633,
98 Daily Journal D.A.R. 9415
 THE INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS
(INTERTANKO), Plaintiff-Appellant,
and
United States of America, Intervenor-Appellant,
v.
Gary LOCKE, Governor of the State of Washington; Christine
O. Gregoire, Attorney General of the State of Washington;
Barbara J. Herman, Administrator of the State of Washington
Office of Marine Safety; David Maceachern, Prosecutor of
Whatcom County; K. Carl Long, Prosecutor of Skagit County;
James H. Krider, Prosecutor of Snohomish County; Norman
Maleng, Prosecutor of King County, Defendants-Appellees,
and
Natural Resources Defense Council; Washington Environmental
Council; Ocean Advocates, Intervenors-Appellees.
 No. 97-35010.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 4, 1998.
Decided June 18, 1998.
As Amended Aug. 31, 1998.
 
 C. Jonathan Benner (argued), Sean T. Connaughton, Darin R. Bartram, Eckert Seamans Cherin & Mellott, Washington, DC; Henry C. Jameson, Jameson, Babbitt, Stites & Lombard, Seattle, Washington, for plaintiff/appellant International Association of Independent Tanker Owners.
 Douglas Letter (argued), United States Department of Justice; Frank H. Hunger, Assistant Attorney General; Katrina C. Pflaumer, United States Attorney, Washington DC, for intervenor/appellant United States.
 William B. Collins (argued), Senior Assistant Attorney General; Jerri L. Thomas, Tanya Barnett, Assistant Attorneys General, Olympia, Washington, for defendants/appellees Gary Locke, Governor, Christine O. Gregoire, Attorney General, Barbara J. Herman, Administrator, David Maceachern, Prosecutor of Whatcom County, K. Carl Long, Prosecutor of Skagit County, Norman Maleng, Prosecutor of King County; Tim W. Dore, Snohomish County Deputy Prosecuting Attorney, Everett, Washington, for defendant/appellee James H. Krider, Snohomish County Prosecuting Attorney.
 Jeffrey L. Needle (argued), John Macdonald, J. Grahame Bell, Seattle, Washington, for intervenors/appellees Washington Environmental Council, Natural Resources Defense Council, and Ocean Advocates Inc.
 
 
 1
 John B. Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for amicus curiae Makah Indian Tribe.
 
 
 2
 Randall K. Gaylord, Prosecuting Attorney, John Briscoe, Louis F. Claiborne, Christopher J. Carr, Washburn, Briscoe & McCarthy, San Francisco, California, for amicus curie San Juan County.
 
 
 3
 Charles L. Coleman, III, Matthew P. Vafidis, Dennis L. Bryant, Haight, Gardner, Poor & Havens, San Francisco, California, for amicus curie International Chamber of Shipping.
 
 
 4
 Appeal from the United States District Court for the Western District of Washington; John C. Coughenour, District Judge, Presiding. D.C. No. CV-95-1096 JCC.
 
 
 5
 Before: BROWNING and O'SCANNLAIN, Circuit Judges, and MARQUEZ,* District Judge.
 
 O'SCANNLAIN, Circuit Judge:
 
 6
 We must decide whether Washington's Best Achievable Protection Regulations, which impose requirements on oil tankers to prevent oil spills, are preempted by comparable federal legislation under the Supremacy Clause or otherwise violate the United States Constitution.
 
 
 7
 * In the aftermath of the Exxon Valdez oil spill in 1989, the State of Washington enacted laws to protect its waters from pollution by oil tankers. See Wash. Rev.Code §§ 88.46.010, et seq.; Wash. Admin. Code §§ 317-21-010, et seq. These provisions require that, in order to transport oil in state waters, tanker operators must: (1) file oil-spill prevention plans with the state, and (2) comply with the state's Best Achievable Protection ("BAP") Regulations, which are promulgated by the Washington Office of Marine Safety. See Wash. Rev.Code § 88.46.040. The International Association of Independent Tanker Owners ("Intertanko") maintains that sixteen of these regulations are unconstitutional. The district court summarized the challenged regulations as follows:
 
 
 8
 1. Event Reporting--WAC 317-21-130. Requires operators to report all events such as collisions, allisions and near-miss incidents for the five years preceding filing of a prevention plan, and all events that occur thereafter for tankers that operate in Puget Sound.
 
 
 9
 2. Operating Procedures--Watch Practices--[WAC 317-21-200].[1] Requires tankers to employ specific watch and lookout practices while navigating and when at anchor, and requires a bridge resource management system that is the "standard practice throughout the owner's or operator's fleet," and which organizes responsibilities and coordinates communication between members of the bridge.
 
 
 10
 3. Operating Procedures--Navigation--WAC 317-21-205. Requires tankers in navigation in state waters to record positions every fifteen minutes, to write a comprehensive voyage plan before entering state waters, and to make frequent compass checks while under way.
 
 
 11
 4. Operating Procedures--Engineering--WAC 317-21-210. Requires tankers in state waters to follow specified engineering and monitoring practices.
 
 
 12
 5. Operating Procedures--Prearrival Tests and Inspections--WAC 317-21-215. Requires tankers to undergo a number of tests and inspections of engineering, navigation and propulsion systems twelve hours or less before entering or getting underway in state waters.
 
 
 13
 6. Operating Procedures--Emergency Procedures--WAC 317-21-220. Requires tanker masters to post written crew assignments and procedures for a number of shipboard emergencies.
 
 
 14
 7. Operating Procedures--Events--WAC 317-21-225. Requires that when an event transpires in state waters, such as a collision, allision or near-miss incident, the operator is prohibited from erasing, discarding or altering the position plotting records and the comprehensive written voyage plan.
 
 
 15
 8. Personnel Policies--Training--WAC 317-21-230. Requires operators to provide a comprehensive training program for personnel that goes beyond that necessary to obtain a license or merchant marine document, and which includes instructions on a number of specific procedures.
 
 
 16
 9. Personnel Policies--Illicit Drugs and Alcohol Use--WAC 317-21-235. Requires drug and alcohol testing and reporting.10. Personnel Policies--Personnel Evaluation--WAC 317-21-240. Requires operators to monitor the fitness for duty of crew members, and requires operators to at least annually provide a job performance and safety evaluation for all crew members on vessels covered by a prevention plan who serve for more than six months in a year.
 
 
 17
 11. Personnel Policies--Work Hours--WAC 317-21-245. Sets limitations on the number of hours crew members may work.
 
 
 18
 12. Personnel Policies--Language--WAC 317-21-250. Requires all licensed deck officers and the vessel master to be proficient in English and to speak a language understood by subordinate officers and unlicensed crew. Also requires all written instruction to be printed in a language understood by the licensed officers and unlicensed crew.
 
 
 19
 13. Personnel Policies--Record Keeping--WAC 317-21-255. Requires operators to maintain training records for crew members assigned to vessels covered by a prevention plan.
 
 
 20
 14. Management--WAC 317-21-260. Requires operators to implement management practices that demonstrate active monitoring of vessel operations and maintenance, personnel training, development, and fitness, and technological improvements in navigation.
 
 
 21
 15. Technology--WAC 317-21-265. Requires tankers to be equipped with global positioning system receivers, two separate radar systems, and an emergency towing system.
 
 
 22
 16. Advance Notice of Entry and Safety Reports--WAC 317-21-540. Requires at least twenty-four hours notice prior to entry of a tanker into state waters, and requires that the notice report any conditions that pose a hazard to the vessel or the marine environment.
 
 
 23
 International Association of Independent Tanker Owners (Intertanko) v. Lowry, 947 F.Supp. 1484, 1488-89 (W.D.Wa.1996) Failure to comply with the BAP Regulations subjects tanker owners to the following: (1) assessment of civil penalties, see Wash. Rev.Code § 88.46.090; (2) criminal prosecution, see Wash. Rev.Code § 88.46.080; and (3) denial of entry into state waters, see Wash. Admin. Code § 317-21-020.
 
 
 24
 Seeking both a declaration that the above-mentioned BAP Regulations are unconstitutional and a permanent injunction against their enforcement, Intertanko filed suit in federal district court.[2] Intertanko alleged that the requirements imposed by the regulations on tanker manning, training, management, safety, and on-board equipment were preempted by various federal statutes, including the Oil Pollution Act of 1990, the Port and Tanker Safety Act of 1978, the Ports and Waterways Safety Act of 1972, and the Tank Vessel Act of 1936. Intertanko also maintained that several of the BAP Regulations were preempted by Coast Guard regulations and by various international treaties. In addition to asserting that the BAP Regulations are invalid under the Supremacy Clause, Intertanko argued that the regulations violate the Commerce Clause and impermissibly infringe upon the foreign affairs power of the federal government.
 
 
 25
 The district court granted the State's motion for summary judgment and upheld every one of the challenged regulations. See Intertanko, 947 F.Supp. at 1500-01. Intertanko filed a timely appeal. Three environmental organizations--the Washington Environmental Council, the Natural Resources Defense Council, and Ocean Advocates--have intervened on behalf of the state defendants, while the United States has intervened on behalf of Intertanko.
 
 II
 
 26
 Intertanko's primary contention on appeal is that the BAP Regulations are preempted by federal law. Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consideration of preemption issues "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Accordingly, " '[t]he purpose of Congress is the ultimate touchstone' " of preemption analysis. Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)).
 
 
 27
 The state defendants maintain that Congress expressly indicated its intent not to preempt state law in the field of oil-spill prevention when it passed § 1018 of the Oil Pollution Act of 1990 ("OPA 90"). See Pub.L. No. 101-380, 104 Stat. 484 (codified at 33 U.S.C. § 2701, et seq.). That provision states, in pertinent part:
 
 
 28
 (a) Preservation of State authorities ... Nothing in this Act[3] or the Act of March 3, 1851 shall--
 
 
 29
 (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to--
 
 
 30
 (A) the discharge of oil or other pollution by oil within such State ....
 
 
 31
 ....
 
 
 32
 (c) Additional requirements and liabilities; penalties Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.) or section 9509 of the Internal Revenue Code of 1986 (26 U.S.C. 9509), shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof--
 
 
 33
 (1) to impose additional liability or additional requirements; or
 
 
 34
 (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;
 
 
 35
 relating to the discharge, or substantial threat of a discharge, of oil.
 
 
 36
 33 U.S.C. § 2718(a) (emphasis added).
 
 
 37
 The state defendants maintain that, by providing that nothing in OPA 90 preempts states from imposing "additional liability or requirements with respect to the discharge of oil or other pollution by oil," 33 U.S.C. § 2718(a); see also 33 U.S.C. § 2718(c), § 1018 grants states broad authority to enact oil-spill prevention regulations. In response, Intertanko argues that the savings clause of § 1018, which is located in Title I of OPA 90, applies only to that Title. Therefore, Intertanko asserts, § 1018 is limited in its application to state laws concerning liability and penalties, the subjects covered by Title I. Intertanko claims that the savings clause does not apply to the other eight Titles of OPA 90, including Title IV, which concerns oil-spill prevention.[4] Therefore, Intertanko contends, the savings clause contained in Title I does not preclude the oil-spill prevention provisions included in Title IV from preempting the oil-spill prevention provisions included in the BAP Regulations. In support of this argument, Intertanko notes that § 1018's savings clause is located not in a preamble to OPA 90, but instead near the end of Title I. Intertanko further observes that the language of § 1018 is consistent with the subject matter of Title I, which concerns oil-spill liability and penalties, but inconsistent with the subject matter of Title IV, which concerns oil-spill prevention.[5]
 
 
 38
 Intertanko's argument that § 1018's savings clause applies only to Title I is at odds with that clause's plain language. Section 1018(a) provides that "[n]othing in this Act " preempts states from "imposing any ... requirements with respect to the discharge of oil or other pollution by oil." 33 U.S.C. 2718(a) (emphasis added). By its plain language, § 1018 applies not only to Title I but to the other eight Titles of OPA 90 as well. Accordingly, because the oil-spill prevention requirements set forth in the BAP Regulations clearly "respect"[6] the discharge of oil, they are not preempted by anything in OPA 90.
 
 III
 
 39
 OPA 90 is not the only federal statute that regulates tanker vessels, however. Other such statutes include the Port and Tanker Safety Act of 1978 ("PTSA"), see Pub.L. No. 95-474, 92 Stat. 471, the Ports and Waterways Safety Act of 1972 ("PWSA"), see Pub.L. No. 92-340, 86 Stat. 424, and the Tank Vessel Act of 1936, see Pub.L. No. 74-765, 49 Stat. 1889. The United States contends that even if OPA 90 does not preempt the challenged BAP Regulations because of the savings clause in § 1018, these other federal statutes do.
 
 
 40
 In response, the state defendants maintain that, by its plain language, the savings clause of § 1018 applies not only to OPA 90 but to the other federal tanker regulation statutes as well. The plain language of § 1018 cannot bear this interpretation. Section 1018 says that nothing "in this Act "[7] preempts state authority to impose additional requirements. See 33 U.S.C. § 2718(a), (c). Thus, § 1018 does not explicitly address whether state oil-spill prevention rules may be preempted by federal "Acts" other than OPA 90.
 
 
 41
 The state defendants also contend that, because OPA 90 amends the PWSA, the PTSA, and the Tank Vessel Act, the savings clause of § 1018 need not expressly refer to those Acts to prevent them from preempting state law. However, the state defendants do not, and could not, offer any authority for the proposition that a savings clause in an Act that amends another Act necessarily applies to the amended Act, even when the savings clause expressly refers to "this Act." Although OPA 90 amended prior federal statutes, § 1018 by its plain language has no automatic impact on preemption caused by those statutes.
 
 IV
 
 42
 Because § 1018 of OPA 90 does not by its plain language affect preemption by federal Acts other than OPA 90, we must determine whether such Acts otherwise impliedly or expressly preempt the BAP Regulations. The Supreme Court has recognized three types of preemption: conflict preemption, field preemption, and express preemption.[8] See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Conflict preemption occurs "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " California v. ARC America Corp., 490 U.S. 93, 100-01, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (citations omitted) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Field preemption exists when federal law so thoroughly occupies a legislative field "as to make reasonable the inference that Congress left no room for the States to supplement it." Fidelity Fed. Sav. & Loan Ass'n. v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146 (1947)). Finally, express preemption exists when Congress explicitly states its intent to displace state law in the statute's language. See Cipollone, 505 U.S. at 516, 112 S.Ct. 2608. The issues of conflict, field, and express preemption were all raised by Intertanko in district court and are raised again on appeal.
 
 
 43
 * We first examine whether the BAP Regulations are subject to conflict preemption. Conflict preemption exists "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " California v. ARC America Corp., 490 U.S. at 100-01, 109 S.Ct. 1661 (quoting Hines, 312 U.S. at 67, 61 S.Ct. 399). Intertanko does not argue that compliance with both federal law and the BAP Regulations is impossible; rather, Intertanko contends that the BAP Regulations interfere with "the full purposes and objectives of Congress." Hines, 312 U.S. at 67, 61 S.Ct. 399.
 
 
 44
 * Congress's first effort in the field of tanker regulation was the Tank Vessel Act, passed in 1936. See Pub.L. No. 74-765, 49 Stat. 1889. The Tank Vessel Act "sought to effect a 'reasonable and uniform set of rules and regulations concerning ship construction ...,' " Ray v. Atlantic Richfield Co., 435 U.S. 151, 166, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978) (quoting H.R.Rep. No. 74-2962, at 2 (1936)).
 
 
 45
 In 1972, the Tank Vessel Act was significantly expanded by the Ports and Waterways Safety Act ("PWSA"), see Pub.L. No. 92-340, 86 Stat. 424, which "subjects to federal rule the design and operating characteristics of oil tankers." Ray, 435 U.S. at 154, 98 S.Ct. 988. The PWSA contains two Titles. Title I is concerned with controlling tanker traffic. See id. at 161, 98 S.Ct. 988. Title I authorizes the Coast Guard to "specify[ ] the times for vessel movement, [to] establish[ ] size and speed limitations and vessel operating conditions, and [to] restrict[ ] vessel operation to those vessels having the particular operating characteristics which [it] considers necessary for safe operation under the circumstances." Id. at 169-70, 98 S.Ct. 988. Whereas Title I of the PWSA focuses on tanker traffic, Title II of the Act is concerned with tanker design, construction, and operation. As the Supreme Court explained in Ray, whereas Title I can be "compare[d] to 'providing safer surface highways and traffic controls for automobiles,' ... Title II [may be] likened to 'providing safer automobiles to transit those highways.' " Id. at 161 n. 9, 98 S.Ct. 988 (quoting S.Rep. No. 92-724, at 9-10 (1972), reprinted in 1972 U.S.C.C.A.N. 2766, 2769).
 
 
 46
 In 1978, the PWSA and Tank Vessel Act were supplemented by the Port and Tanker Safety Act ("PTSA"). See Pub.L. No. 95-474, 92 Stat. 1471. The PTSA requires the Secretary of Transportation to establish regulations addressing vessel management, drug and alcohol testing, seafarer training and qualifications, casualty reporting, seafarer discipline, manning, work hours, pilotage, and language requirements. See 46 U.S.C. §§ 9101, 9102.
 
 
 47
 The federal tanker regulation scheme was again substantially altered when Congress passed OPA 90. See Pub.L. No. 101-380, 104 Stat. 484. Enacted following the Exxon Valdez oil spill, OPA 90 addresses oil-pollution prevention, removal, liability, and compensation. See 33 U.S.C. § 2701, et. seq. OPA 90 imposed a number of new federal oil-spill prevention requirements, including: random drug and alcohol testing, see 46 U.S.C. § 7702; a provision mandating that working hours on a tanker be no more than 15 hours in any 24-hour period, or more than 36 hours in any 72-hour period, see 46 U.S.C. § 8104(n); and a requirement that tankers be equipped with double hulls, see 46 U.S.C. § 3703a.
 
 
 48
 Intertanko maintains that the BAP Regulations frustrate the purposes and objectives of Congress in adopting this legislative scheme. We disagree. In determining "the full purposes and objectives of Congress," Hines, 312 U.S. at 67, 61 S.Ct. 399, we must look not to the purposes and objectives of any single Act, but instead to Congress's overarching purposes and objectives in the relevant legislative field. See California v. ARC America Corp., 490 U.S. at 102, 109 S.Ct. 1661 ("Appellees' only contention is that state laws permitting indirect purchaser recoveries pose an obstacle to the accomplishment of the purposes and objectives of Congress. State laws to this effect are consistent with the broad purposes of the federal antitrust laws . ...") (citing cases involving both Sherman Act and Clayton Act) (emphasis added). In the field of tanker regulation, the overarching purposes of Congress are best revealed by OPA 90. As the most recent federal statute in the field, OPA 90 reflects "the full purposes and objectives of Congress," Hines, 312 U.S. at 67, 61 S.Ct. 399 (emphasis added), better than the PWSA, the PTSA, or the Tank Vessel Act, all of which OPA 90 was designed to complement.
 
 
 49
 As explained above, § 1018 of OPA 90 does not expressly apply to other federal "Acts." However, the enactment of a new federal statute in a particular legislative field may influence whether state laws in that field "frustrate the full purposes and objective of Congress." Hines, 312 U.S. at 67, 61 S.Ct. 399 (emphasis added). This is true even if the new statute contains a non-preemption clause which does not address other statutes in the field, cf. Freightliner Corp. v. Myrick, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (existence of statutory provision containing "express definition of the pre-emptive reach of a statute ... does not mean that the express clause entirely forecloses any possibility of implied pre-emption"), or does not contain a non-preemption clause at all, see California v. ARC America Corp., 490 U.S. at 102, 109 S.Ct. 1661. Section 1018 of OPA 90 sheds considerable light upon the purposes and objectives of Congress in effectuating a federal scheme of tanker regulation. That provision demonstrates Congress's willingness to permit state efforts in the areas of oil-spill prevention, removal, liability, and compensation. Accordingly, we decline Intertanko's invitation to strike down the challenged BAP Regulations in their entirety on the ground that they frustrate Congress's purposes and objectives in enacting OPA 90, the PWSA, the PTSA, and the Tanker Safety Act.
 
 2
 
 50
 Intertanko next contends that the BAP Regulations frustrate the purposes and objectives of Congress because they conflict with various international treaties. These treaties include: the International Convention for the Safety of Life at Sea, Nov. 1, 1974, 32 U.S.T. 47; the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, Feb. 17, 1978, 17 I.L.M. 546; the Multilateral International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 28 U.S.T. 3459; the Agreement for a Cooperative Vessel Traffic Management System for the Juan de Fuca Region, Dec. 19, 1979, 32 U.S.T. 377; and the United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1261.[9]
 
 
 51
 As the Supreme Court observed in Hines, in determining whether a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ... it is of importance that [the state] legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority." Hines, 312 U.S. at 67-68, 61 S.Ct. 399. States have no power to override international agreements entered into by the federal government. See Zschernig v. Miller, 389 U.S. 429, 441, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).
 
 
 52
 Intertanko's argument that the BAP Regulations are preempted by these international treaties is undermined by our decision in Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483 (9th Cir.1984). In Chevron, we held that an Alaska statute that prohibited tankers from discharging ballast into the territorial waters of Alaska was not preempted by either federal statute or international agreement. See Chevron, 726 F.2d at 485. We stated:
 
 
 53
 [T]he PWSA/PTSA does not mandate strict international uniformity. Although the legislative history of the PWSA/PTSA refers to congressional intent to abide by international agreements regarding the regulation of tankers, the statute nonetheless gives the Coast Guard specific authority to establish stricter requirements than those set by international agreements. This indicates Congress' view that the international agreements set only minimum standards, that strict international uniformity was unnecessary, and that standards stricter than the international minimums could be desirable in waters subject to federal jurisdiction.
 
 
 54
 Id. at 493-94 (citations omitted) (emphasis added).
 
 
 55
 Passage of OPA 90 by Congress only reinforces this court's conclusions in Chevron that "strict international uniformity" with respect to the regulation of tankers is not "mandate[d]" by federal law and that "international agreements set only minimum standards." Id. at 493. To reach any other conclusion, we would have to read § 1018 to provide that the Act permits state tanker regulation only when the field in question is not subject to international regulation. However, § 1018 plainly states that nothing in the Act shall be interpreted to prohibit states from imposing "any additional liability or requirements," 33 U.S.C. § 2718(a) (emphasis added), not merely "additional liability or requirements where such requirements would not conflict with an international treaty."
 
 3
 
 56
 The United States raises for the first time on appeal two arguments concerning specific conflicts between the BAP Regulations and international treaties. These arguments are: (1) that the BAP Regulations interfere with the international right of "innocent passage," see United Nations Convention on the Law of the Sea, Dec. 10, 1982, § 3, arts. 17-25, 21 I.L.M. 1261, 1273-75; and (2) that the BAP Regulations conflict with a bilateral agreement between the United States and Canada concerning traffic in the Strait of Juan de Fuca at the entrance to Puget Sound, see The Agreement for a Cooperative Vessel Traffic Management System for the Juan de Fuca Region, Dec. 19, 1979, 32 U.S.T. 377. Generally, we will not consider arguments that are raised for the first time on appeal. See Self Directed Placement Corp. v. Control Data Corp., 908 F.2d 462, 466 (9th Cir.1990); Abex Corp. v. Ski's Enters., Inc., 748 F.2d 513, 516 (9th Cir.1984). The court has discretion to address such arguments only: (1) "in the 'exceptional' case in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process," Bolker v. Commissioner, 760 F.2d 1039, 1042 (9th Cir.1985) (quoting United States v. Greger, 716 F.2d 1275, 1277 (9th Cir.1983)); (2) "when a new issue arises while appeal is pending because of a change in the law," id.; or (3) "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed," id.
 
 
 57
 In support of its claim that we may exercise our discretion to address its new arguments, the United States cites our decision in Kimes v. Stone, 84 F.3d 1121 (9th Cir.1996), in which we considered a Supremacy Clause argument raised for the first time on appeal. See id. at 1126. In Kimes, however, we noted that the issue was "purely a question of law" and that "consideration of the issue would not prejudice [the opposing party's] ability to present relevant facts that could affect our decision." Id. By contrast, the state defendants have not had the opportunity to develop the record concerning whether the BAP Regulations practically impair the right of innocent passage or are enforced in a manner that is inconsistent with the bilateral agreement with Canada covering traffic in the Strait of Juan de Fuca. Accordingly, we do not consider the United States's new treaty-based arguments on appeal.[10]
 
 B
 
 58
 Intertanko next argues that federal regulation of oil tankers by OPA 90, the PWSA, the PTSA, and the Tank Vessel Act is so comprehensive as to preempt impliedly the field of tanker regulation. Field preemption exists when federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " Fidelity Fed. Sav. & Loan Assn., 458 U.S. at 153, 102 S.Ct. 3014 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. at 230, 67 S.Ct. 1146). The leading case on the subject of field preemption of state statutes that regulate tankers is Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). In Ray, the Supreme Court examined the preemptive effect of the PWSA on the Washington Tanker Law, 1975 Wash. Laws ch. 125, a statute that required various design-safety features for tankers operating in Puget Sound. The Court found that certain safety features imposed by the Washington Tanker Law were preempted, but that others were not. See Ray, 435 U.S. at 160, 168, 173, 178, 180, 98 S.Ct. 988.
 
 
 59
 * One of the provisions of the Washington Tanker Law addressed in Ray required oil tankers weighing between 40,000 and 125,000 deadweight tons to possess certain safety features, including a minimum amount of horsepower, twin screws, two radars, and double hulls. See id. at 160, 98 S.Ct. 988. After a thorough examination of the regulatory scheme established by Title II of the PWSA, the Court found that these state requirements were impliedly preempted. See id. at 168, 98 S.Ct. 988. However, this finding of implied preemption was limited to the field of tanker "design and construction." Id. at 163-64, 98 S.Ct. 988. The Court stated:
 
 
 60
 This statutory pattern shows that Congress, insofar as design characteristics are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States. This indicates to us that Congress intended uniform national standards for design and construction of tankers that would foreclose the imposition of different or more stringent state requirements. In particular, as we see it, Congress did not anticipate that a vessel found to be in compliance with the Secretary's design and construction regulations and holding a Secretary's permit, or its equivalent, to carry the relevant cargo would nevertheless be barred by state law from operating in the navigable waters of the United States on the ground that its design characteristics constitute an undue hazard.
 
 
 61
 Id. (emphasis added); see also id. at 165, 98 S.Ct. 988 ("Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers.") (emphasis added); id. at 166, 98 S.Ct. 988 ("That the Nation was to speak with one voice with respect to tanker-design standards is supported by the legislative history of Title II ....") (emphasis added); id. at 166 n. 15, 98 S.Ct. 988 ("The Court has previously observed that ship design and construction are matters for national attention.") (emphasis added); id. at 168 n. 19, 98 S.Ct. 988 ("Here it is sufficiently clear that Congress directed the promulgation of standards on the national level, as well as national enforcement, with vessels having design characteristics satisfying federal law being privileged to carry tank-vessel cargoes in United States waters.") (emphasis added).
 
 
 62
 The Ray Court next proceeded to examine a provision of the Washington Tanker Law mandating tug escorts for any vessel that did not have the safety features required by the Tanker Law's other provisions. See id. at 171, 98 S.Ct. 988. The Court began its analysis of the tug-escort requirement by observing that a tanker's certification "under federal law as a vessel safe insofar as its design and construction characteristics are concerned does not mean that it is free to ignore otherwise valid state or federal rules or regulations that do not constitute design or construction specifications." Id. at 168-69, 98 S.Ct. 988. The Court noted that the Washington Tanker Law's tug escort provision was "not a design requirement," but instead was "more akin to an operating rule arising from the peculiarities of local waters that call for special precautionary measures." Id. at 171, 98 S.Ct. 988. The Court further observed that "[t]he relevant inquiry ... with respect to the State's power to impose a tug-escort rule is ... whether the [Coast Guard] has either promulgated [its] own tug requirement for Puget Sound tanker navigation or has decided that no such requirement should be imposed at all." Id. at 171-72, 98 S.Ct. 988. The Court concluded that because the Secretary had not imposed such a requirement, "the State's requirement need not give way under the Supremacy Clause." Id. at 172, 98 S.Ct. 988. These excerpts from Ray teach that "operating rule[s]," id. at 171, 98 S.Ct. 988, unlike design and construction requirements, are not automatically subject to field preemption by the PWSA. Attempting to distinguish Ray, Intertanko argues that Ray's analysis of "operating rule[s], id., applies only to those requirements that "aris[e] from the peculiarities of local waters." Id. This argument fails to recognize, however, that the operating requirements imposed by the BAP Regulations are designed for the same "local waters," namely Puget Sound, as was the Washington Tanker Law contested in RAY.[11]
 
 
 63
 Intertanko also maintains that Ray used the phrase "design and construction" as a "shorthand" for all Title II PWSA matters, which include tanker operations as well as design and construction. Intertanko's interpretation of Ray, however, is plainly inconsistent with our own interpretation of the same case in Chevron. In Chevron, we stated:
 
 
 64
 The [Ray ] Court's finding of preemption is specifically limited to the regulation of vessel "design characteristics " and thus does not control the outcome of the present case involving ocean pollutant discharges. As a matter of fact, the court specifically explained that tankers must meet "otherwise valid state or federal rules or regulations that do not constitute design or construction specifications."
 
 
 65
 Chevron, 726 F.2d at 487 (citations omitted) (quoting Ray, 435 U.S. at 168-69, 98 S.Ct. 988) (emphasis added). We concluded in Chevron that "deballasting" does not qualify as "design or construction" and that, consequently, deballasting regulations were not automatically preempted under Ray. Id. Because the discharge of ballast involves an "operation" directly related to the sailing of a tanker,[12] Chevron undermines Intertanko's argument that the Ray Court used "design and construction" as "shorthand" for "design, construction, and operations."
 
 
 66
 Virtually all of the challenged BAP Regulations impose operational requirements rather than design and construction requirements. These operational requirements include: accident reporting, see Wash. Admin. Code § 317-21-130; watch practices, see Wash. Admin. Code § 317-21-200; navigation procedures, see Wash. Admin. Code § 317-21-205; engineering procedures, see Wash. Admin. Code § 317-21-210; prearrival tests and inspections, see Wash. Admin. Code § 317-21-215; emergency procedures, see Wash. Admin. Code § 317-21-220; rules against altering or destroying records, see Wash. Admin. Code § 317-21-225; training programs, see Wash. Admin. Code § 317-21-230; illicit drugs and alcohol use, see Wash. Admin. Code § 317-21-235; personnel evaluation, see Wash. Admin. Code § 317-21-240; work hours, see Wash. Admin. Code § 317-21-245; language requirements, see Wash. Admin. Code § 317-21-250; training records for crew members, see Wash. Admin. Code § 317-21-255; management, see Wash. Admin. Code § 317-21-260; and advance notice of entry and safety reports, see Wash. Admin. Code § 317-21-540. Because these regulations do not qualify as "design and construction" requirements, they are not automatically subject to field preemption under Ray.
 
 2
 
 67
 We reach a different conclusion with respect to Wash. Admin. Code § 317-21-265, however.[13] The first subsection of that provision, entitled "Navigation Equipment," requires tankers to possess global positioning system ("GPS") receivers, as well as two separate radar systems. See Wash. Admin. Code § 317-21-265(1). The navigational equipment requirements imposed therein are virtually indistinguishable from the radar and navigation devices that the Ray Court found to be regulated preemptively by the PWSA. The Washington Tanker Law challenged in Ray required "[t]wo radars in working order and operating, one of which must be collision avoidance radar." Ray, 435 U.S. at 160, 98 S.Ct. 988. The Ray Court, after reviewing the requirements of the Washington Tanker Law, including the radar and navigational equipment requirements, stated that "the foregoing design requirements, standing alone, are invalid in light of the PWSA and its regulatory implementation." Id. at 160-61, 98 S.Ct. 988 (emphasis added). Because the GPS and radar requirements are virtually identical to the navigational equipment required by the Washington Tanker Law, Ray dictates that Wash. Admin. Code § 317-21-265(1) must also be classified as a "design requirement[ ]." Id. at 160-61, 98 S.Ct. 988. Applying Ray, we hold that Wash. Admin. Code § 317-21-265(1) is preempted by the PWSA.
 
 
 68
 In support of its conclusion that the navigational equipment rules imposed by Wash. Admin. Code § 317-21-265(1) are not "design requirements" subject to preemption under Ray, the district court stated that "[t]he requirements for global positioning system receivers and two separate radar systems under WAC 317-21-265 should be considered equipment necessary for vessel operating procedures under 33 U.S.C. § 1223," and therefore "are not subject to implied preemption." Intertanko, 947 F.Supp. at 1495 n. 9. Regardless of whether radar and other navigational systems "should" be considered "equipment necessary for vessel operating procedures," the Supreme Court considered them "design requirements." Ray, 435 U.S. at 160-61, 98 S.Ct. 988. We are bound by the Ray Court's classification of these devices as "design requirements," and by its conclusion that, as such, they are impliedly preempted by the PWSA. See id.
 
 
 69
 The second requirement imposed by Wash. Admin. Code § 317-21-265 is that all ships be equipped with an emergency towing package. See Wash. Admin. Code § 317-21-265(2). The state defendants contend that the towing package provision is "not a design or construction requirement," but rather a "requirement to have certain equipment installed on a tanker," and that, consequently, this provision is not preempted under Ray. However, the state defendants' argument fails to recognize that "design requirements" and "equipment requirements" are not mutually exclusive. See Chevron, 726 F.2d at 500 ("Alaska has left all designing of vessels and equipment to the Coast Guard and has only prohibited the discharge of polluted ballast.") (emphasis added). Section 317-21-265(2) provides that towing equipment must meet several specific design standards. These standards include "[d]esignated strong points," Wash. Admin. Code § 317-21-265(2)(a), and "[a]ppropriate chafing chains, towing pennant, tow line and connections," Wash. Admin. Code § 317-21-265(2)(b), all of which must be capable of withstanding "sustained winds of forty knots and sea or swell of five and a half meters," Wash. Admin. Code § 317-21-265(2)(a), (b). Because such design requirements are preempted by the PWSA, see Ray, 435 U.S. at 160-61, 98 S.Ct. 988, we hold that the emergency towing package requirement, like the GPS and radar requirements, is invalid under the Supremacy Clause.
 
 C
 
 70
 We finally address whether any of the BAP Regulations are expressly preempted by federal law. In Ray, the Supreme Court held that, because the challenged tug-escort rule was not a design or construction requirement, "[t]he relevant inquiry ... with respect to the State's power to impose [the] tug-escort rule is ... whether the Secretary has either promulgated his own tug requirement for Puget Sound tanker navigation or has decided that no such requirement should be imposed at all." Ray, 435 U.S. at 171-72, 98 S.Ct. 988. Ray thus teaches that once a court has determined that state tanker regulations are not subject to implied preemption as "design and construction" requirements, the court still must examine whether the state regulations are expressly preempted. Accordingly, having determined that all of the BAP Regulations except Wash. Admin. Code § 317-21-265 are not subject to implied preemption as design and construction requirements, we must now inquire whether those regulations are subject to express preemption.
 
 
 71
 Intertanko contends that some of the BAP Regulations are expressly preempted not by any federal statute but by a variety of federal regulations issued by the Coast Guard. A federal agency, acting through its rulemaking processes, can effect preemption of state law. See Fidelity Fed. Sav. & Loan Ass'n, 458 U.S. at 153-54, 102 S.Ct. 3014. Indeed, "[f]ederal regulations have no less pre-emptive effect than federal statutes." Id. at 153, 102 S.Ct. 3014. According to Intertanko, certain of the BAP Regulations are expressly preempted by Coast Guard statements accompanying the issuance of federal regulations concerning watch practices, see 58 Fed.Reg. 27,268, 27,632 (1993); steering gear for vessels underway, see 60 Fed.Reg. 24,767, 24,771 (1995); and drug and alcohol testing, see 58 Fed.Reg. 68,274, 68,277 (1993).[14]
 
 
 72
 Preemption by regulations enacted by a federal agency does not occur if that agency is acting beyond the scope of its delegated powers. As the Supreme Court explained in Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):
 
 
 73
 [A] federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority.... [A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.
 
 
 74
 ....An agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do.
 
 
 75
 Id. at 374-75, 106 S.Ct. 1890; see also United States v. Shimer, 367 U.S. 374, 381-82, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961) (administrative agency cannot preempt state law if "it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned").
 
 
 76
 Louisiana Public Service Commission teaches that the relevant inquiry in determining whether a federal regulation preempts state law is whether the agency "is acting within the scope of its congressionally delegated authority." Id. at 374, 81 S.Ct. 1554. When it passed OPA 90, Congress required the Coast Guard to implement a wide range of oil-spill prevention rules. See 33 U.S.C. §§ 2701-2718. However, Congress did not explicitly or impliedly delegate to the Coast Guard the authority to preempt state law. Indeed, § 1018 of OPA 90 establishes that nothing in OPA 90 may be construed as impairing the ability of the states to impose their own oil-spill prevention requirements.[15] See 33 U.S.C. § 2718. In view of Congress's unwillingness to preempt state oil-spill prevention efforts on its own, we find implausible the argument that it intended to delegate power to the Coast Guard to do so. Therefore, we reject Intertanko's position that the Coast Guard was "acting within the scope of its congressionally delegated authority," Louisiana Pub. Serv. Comm'n, 476 U.S. at 374, 106 S.Ct. 1890, in enacting regulations that purport to preempt state law.
 
 V
 
 77
 Intertanko next contends that the BAP Regulations violate the Commerce Clause. The Commerce Clause provides that "[t]he Congress shall have Power ... To regulate Commerce ... among the several states...." U.S. Const., art. I, § 8. Although this clause by its express terms serves only as an affirmative grant to the federal government of the power to regulate interstate commerce, it has also been interpreted by the Supreme Court to impose limits on the ability of the states to do so. See Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 117 S.Ct. 1590, 1596, 137 L.Ed.2d 852 (1997).
 
 
 78
 The Supreme Court has distinguished between two types of impermissible state regulations that incidentally burden interstate commerce. A facially nondiscriminatory regulation supported by a legitimate state interest which incidentally burdens interstate commerce is constitutional unless the burden on interstate trade is clearly excessive in relation to the local benefits. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). However, when a regulation "clearly" discriminates against interstate commerce, it violates the Commerce Clause unless the discrimination is demonstrably justified by a valid factor unrelated to state protectionism. See Wyoming v. Oklahoma, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). In Pacific Northwest Venison Producers v. Smitch, 20 F.3d 1008 (9th Cir.1994), this court summarized the proper analysis as follows:
 
 
 79
 If the regulations discriminate in favor of in-state interests, the state has the burden of establishing that a legitimate state interest unrelated to economic protectionism is served by the regulations that could not be served as well by less discriminatory alternatives. In contrast, if the regulations apply evenhandedly to in-state and out-of-state interests, the party challenging the regulations must establish that the incidental burdens on interstate and foreign commerce are clearly excessive in relation to the putative local benefits.
 
 
 80
 Id. at 1012 (citations omitted).
 
 
 81
 Intertanko asserts that the cost for a tanker operator to develop an oil-spill prevention plan that meets the standards established by the BAP Regulations is approximately $12,000. However, Intertanko fails to point to any evidence in the record to establish that this "incidental burden[ ] on interstate and foreign commerce [is] clearly excessive in relation to the putative local benefits." Id. Nor does Intertanko even argue that the BAP Regulations "discriminate in favor of in-state interests." Id. Therefore, Intertanko's contention that the BAP Regulations violate the Commerce Clause is without merit.
 
 VI
 
 82
 Finally, Intertanko maintains that the BAP Regulations impermissibly intrude upon the foreign affairs power of the federal government. The Constitution entrusts the administration of foreign affairs to the President and to Congress. See Zschernig v. Miller, 389 U.S. 429, 432, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). Accordingly, "any state law that involves the state in the actual conduct of foreign affairs is unconstitutional." Id.
 
 
 83
 The only case in which the Supreme Court has struck down a state statute as violative of the foreign affairs power is Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). Zschernig involved an Oregon statute providing that a nonresident alien could not inherit from an Oregon decedent unless certain conditions were met. See id. at 440, 88 S.Ct. 664. The Supreme Court struck down the Oregon statute on the ground that it had "more than 'some incidental or indirect effect in foreign countries.' " Id. at 434, 88 S.Ct. 664 (quoting Clark v. Allen, 331 U.S. 503, 516-17, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947)).
 
 
 84
 By their own terms, the BAP Regulations apply only to vessels operating within Washington's territorial limits. See Wash. Rev.Code § 88.46.010. Intertanko objects to the potential extraterritorial impact of requirements that: (1) owners report hazardous events regardless of whether the events occur outside of Washington, see Wash. Admin. Code § 317-21-130; (2) crew training and drill programs be conducted, see Wash. Admin. Code § 317-21-230; (3) personnel and record keeping procedures be administered, see Wash. Admin. Code § 317-21-255; and (4) owner and operations management programs be followed, see Wash. Admin. Code § 317-21-260. However, Intertanko has failed to demonstrate that, even if these regulations have some extraterritorial impact, that impact is more than "incidental or indirect." Zschernig, 389 U.S. at 434, 88 S.Ct. 664. Accordingly, we reject Intertanko's argument that the BAP Regulations infringe upon the foreign affairs power of the federal government.
 
 VII
 
 85
 We affirm in part and reverse in part the district court's grant of summary judgment in favor of the State of Washington. We reverse the district court's holding that Wash. Admin. Code § 317-21-265 is not preempted by federal law. However, we affirm the district court's judgment as to all other challenged BAP Regulations. Each side shall bear its own costs on appeal.
 
 
 86
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 The Honorable Alfredo C. Marquez, Senior Judge, United States District Court for the District of Arizona, sitting by designation
 
 
 [1]
 The district court misidentified this regulation as "WAC 317-21-130." International Association of Independent Tanker Owners (Intertanko) v. Lowry, 947 F.Supp. 1484, 1488 (W.D.Wa.1996)
 
 
 [2]
 Intertanko named as defendants the Governor of Washington and various other state and local officials responsible for the promulgation and enforcement of the regulations
 
 
 [3]
 When OPA 90 was codified, all references to "Act" became "chapter."
 
 
 [4]
 OPA 90 contains nine Titles. These include: Title I, Oil Pollution Liability and Compensation; Title II, Conforming Amendments; Title III, International Oil Pollution Prevention and Removal; Title IV, Prevention and Removal; Title V, Prince William Sound Provisions; Title VI, Miscellaneous Provisions; Title VII, Oil Pollution Research and Development Program; Title VIII, Trans-Alaska Pipeline System; and Title IX, Oil Spill Fund Transfers. See 33 U.S.C. § 2701, et seq
 
 
 [5]
 Intertanko also points out that Title I of OPA 90 is labeled "Liability and Compensation." However, § 6001(c) of OPA 90 states that "[a]n inference of legislative construction shall not be drawn by reason of the caption or catch line of a provision enacted by this Act." 33 U.S.C. § 2751(c)
 
 
 [6]
 Like the phrase "relating to" employed in § 1018(c), the phrase "with respect to" used in § 1018(a) is "clearly expansive." De Buono v. NYSA-ILA Medical & Clinical Servs. Fund, 520 U.S. 806, ----, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997) (discussing "relate to" language of Employee Retirement Income Security Act of 1974). However, we decline to read § 1018's language "according to its terms ... since, as many a curbstone philosopher has observed, everything is related to everything else." California Div. of Labor Standards Enforcement v. Dillingham Constr. N.A., 519 U.S. 316, 117 S.Ct. 832, 843, 136 L.Ed.2d 791 (Scalia, J., concurring). Rather, in determining whether state oil-spill prevention laws "respect" or "relate to" the "discharge of oil," we must look to the "objectives" of OPA 90. See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins., 514 U.S. 645, 655-56, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (in determining scope of clause preempting "all state laws insofar as they ... relate to any employee benefit plan," courts must "look to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive") (emphasis added). Because one of the explicit "objectives" of OPA 90 is oil-spill prevention, see OPA 90 §§ 2701-2718 (Title IV--Oil Spill Prevention), § 1018 prevents anything in OPA 90 from preempting state laws in this field
 
 
 [7]
 Section 1018 refers to "the Act of March 3, 1851" as well as "this Act." The 1851 Act is a limitation of liability statute that permits a party to enjoin all pending suits and to compel them to be filed in a special limitation proceeding. It is undisputed that the 1851 Act is not relevant to this appeal
 
 
 [8]
 As the Supreme Court observed in English v. General Electric Co., 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), these categories are not "rigidly distinct." Id. at 79 n. 5, 110 S.Ct. 2270
 
 
 [9]
 Despite being a signatory, the United States has not ratified the United Nations Convention on the Law of the Sea
 
 
 [10]
 The United States does not assert that we have discretion to entertain its new arguments on miscarriage-of-justice grounds or because of a post-appeal change in the law
 
 
 [11]
 Intertanko asks us to rule that Ray's holding does not apply to "on-board" operating rules. However, the relevant passage from Ray plainly refers to "operating rule[s]," Ray, 435 U.S. at 171, not merely "off-board operating rules." Contrary to what Intertanko's argument implies, we are not at liberty to limit a holding of the United States Supreme Court to its facts
 
 
 [12]
 As we observed in Chevron:
 Unloaded oil tankers must take on seawater for ballast to ensure proper submergence and vessel stability. Upon arrival in port, the tankers must then discharge this ballast--i.e., "deballast"--before loading their cargo tanks with oil.
 Chevron, 726 F.2d at 485.
 
 
 [13]
 Wash. Admin. Code § 317-21-265 provides, in full:
 (1) Navigation Equipment. An oil spill prevention plan for a tank vessel must describe navigation equipment used on a vessel covered by the plan which includes:
 (a) Global positioning system (GPS) receivers; and
 (b) Two separate radar systems, one of which is equipped with an automated radar planning aid (ARPA).
 (2) Emergency towing system. Tankers must be equipped with an emergency towing system on both the bow and stern within two years from the effective date of this chapter. The emergency towing system comprises:
 (a) Designated strong points able to withstand the load to which they may be subjected during a towing operation in maximum sustained winds of forty knots and sea or swell heights of five and a half meters (18 feet);
 (b) Appropriate chafing chains, towing pennant, tow line and connections of a size and strength to tow the tanker fully laden in maximum sustained winds of forty knots and sea or swell heights of five and a half meters (18 feet); and
 (c) Appropriately sized and colored marker buoys attached to the towing pennants.
 (3) The emergency towing system must be deployable:
 (a) In 15 minutes or less by at most two crew members;
 (b) From the bridge or other safe location when the release points are inaccessible; and
 (c) Without use of the vessel's electrical power.
 
 
 [14]
 Intertanko also contends that Wash. Admin. Code § 317-21-265 (navigation equipment and emergency towing system) is preempted by a Coast Guard regulation concerning on-board towing equipment. See 58 Fed.Reg. 67,988, 67,993 (1993). Because we hold that Wash. Admin. Code § 317-21-265 is invalid under Ray, we need not address this argument
 
 
 [15]
 Although § 1018 expressly applies only to OPA 90, it shapes the "full purposes and objectives" of Congress, Hines, 312 U.S. at 67, 61 S.Ct. 399, with respect to the entire legislative field of oil-spill prevention. See Part IV.A.1, infra. Accordingly, we hold that the operational requirements imposed by the BAP Regulations are not preempted by any federal regulations