159 F.3d 1220
 1999 A.M.C. 729, 29 Envtl. L. Rep. 20,281,
98 Daily Journal D.A.R. 11,949
 The INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS
(INTERTANKO), Plaintiff-Appellant,
and
United States of America, Intervenor-Appellant,
v.
Gary LOCKE, Governor of the State of Washington; Christine
O. Gregoire, Attorney General of the State of Washington;
Barbara J. Herman, Administrator of the State of Washington
Office of Marine Safety; David MacEachern, Prosecutor of
Whatcom County; K. Carl Long, Prosecutor of Skagit County;
James H. Krider, Prosecutor of Snohomish County; Norman
Maleng, Prosecutor of King County, Defendants-Appellees,
and
Natural Resources Defense Council; Washington Environmental
Council; Ocean Advocates, Intervenors-Appellees.
 No. 97-35010.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 24, 1998.
 
 1
 Before: BROWNING and O'SCANNLAIN, Circuit Judges, and MARQUEZ,* District Judge.
 
 Prior report: 148 F.3d 1053
 ORDER
 
 2
 The panel has unanimously voted to deny the petitions for rehearing. Judge Browning and Judge O'Scannlain have voted to reject the suggestions for rehearing en banc, and Judge Marquez so recommends.
 
 
 3
 The full court was advised of the suggestions for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused judges in favor of en banc consideration. Fed. R.App. P. 35.
 
 
 4
 The petitions for rehearing are DENIED and the suggestions for rehearing en banc are REJECTED.
 
 GRABER, Circuit Judge, dissenting:
 
 5
 I respectfully dissent from the court's decision not to rehear this case en banc.
 
 
 6
 This is the first published appellate decision interpreting the preemptive effect of the Oil Pollution Act of 1990 (OPA 90). The preemptive effect of OPA 90 is an issue of exceptional importance to the coastal states within the Ninth Circuit. See Fed. R.App. P. 35(a)(2) (providing that en banc consideration is appropriate "when the proceeding involves a question of exceptional importance").[1]
 
 
 7
 Additionally, although I do not suggest that the Washington regulations necessarily are invalid, the opinion's analysis is incorrect in two exceptionally important respects: (1) The opinion places too much weight on two clauses in Title I of OPA 90 that limit OPA 90's preemptive effect. (2) Portions of the opinion that discuss the Coast Guard regulations are inconsistent with Ninth Circuit and Supreme Court precedent. Those issues warrant en banc consideration even if the opinion's ultimate result proves to be correct, a question as to which I express no view.
 
 APPLICATION OF OPA 90'S PREEMPTION CLAUSES
 
 8
 Congress enacted OPA 90 in response to the Exxon Valdez oil spill. OPA 90 combined numerous bills into one comprehensive Act with nine titles. Title IV contains measures designed, in part, to prevent oil spills, while Title I regulates liability and compensation for oil spills. Congress placed the two pertinent preemption provisions in Title I. Those provisions state:
 
 
 9
 Nothing in this Act or the Act of March 3, 1851 shall--
 
 
 10
 (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to--
 
 
 11
 (A) the discharge of oil or other pollution by oil within such State; or
 
 
 12
 (B) any removal activities in connection with such a discharge; or
 
 
 13
 (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.
 
 
 14
 Section 1018(a) of OPA 90 (codified at 33 U.S.C. § 2718(a)).
 
 
 15
 Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of the Internal Revenue Code of 1986 (26 U.S.C. 9509), shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof--
 
 
 16
 (1) to impose additional liability or additional requirements; or
 
 
 17
 (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;
 
 
 18
 relating to the discharge, or substantial threat of a discharge, of oil.
 
 
 19
 Section 1018(c) of OPA 90 (codified at 33 U.S.C. § 2718(c)).
 
 
 20
 The opinion reasons that the "plain language" of those preemption clauses indicates that Congress intended for them to apply to the oil spill prevention measures in Title IV. See The International Assoc. of Indep. Tanker Owners (Intertanko) v. Locke, 148 F.3d 1053, 1060 (9th Cir.1998) ("By its plain language, § 1018 applies not only to Title I but to the other eight Titles of OPA 90 as well."). See also Sloan v. West, 140 F.3d 1255, 1261 (9th Cir.1998) ("If the intent of Congress is clear from the face of the statutory language, we must give effect to the unambiguously expressed Congressional intent."). The opinion bases its "plain language" holding on Congress' use of the term "this Act" in discussing the reach of the clauses. Intertanko, 148 F.3d at 1060. That reasoning is incomplete.
 
 
 21
 The term "this Act" does plainly indicate Congress' intention to embrace all of OPA 90. However, examining the term "this Act" does not end the analysis. Grammatically, because of its placement in the sentences that comprise the preemption clauses, the term says only that "[n]othing in this Act" shall affect certain things--but we still must consider the meaning of those certain things that "[n]othing in this Act" is allowed to affect. At their broadest, the preemption clauses provide that "[n]othing in this Act ... shall in any way affect ... the authority of ... any State ... to impose additional liability or additional requirements ... relating to the discharge, or substantial threat of a discharge, of oil." § 1018(c).
 
 
 22
 That phrase, read as a whole, is ambiguous, because it plausibly can be understood in two ways. One plausible way to read the phrase is that any state regulation designed to prevent an oil spill is a "requirement[ ] ... relating to the discharge, or substantial threat of a discharge, of oil," because in the broadest sense a preventive measure "relates" to the thing being prevented. Another plausible way to read the phrase, however, is to embrace only state regulations that impose "requirements" pertaining specifically "to the discharge, or substantial threat of a discharge, of oil" once it has occurred. That is, if a discharge is being prevented, there never comes into being a "discharge, or substantial threat of a discharge, of oil." Under the latter, narrower reading, a preventive measure does not relate to an oil "discharge, or substantial threat of a discharge," because its very purpose is to avert an oil discharge, or substantial threat of discharge, and the specified condition of the sentence is never met.
 
 
 23
 In summary, Congress could have intended to allow any state regulation that might prevent an oil spill, or Congress could have intended a more limited reach. The opinion acknowledges the ambiguity in this provision, which it resolves by analyzing the objectives of Congress. See Intertanko, 148 F.3d at 1060 n. 6 ("Like the phrase 'relating to' employed in § 1018(c), the phrase 'with respect to' used in § 1018(a) is clearly expansive. However, we decline to read § 1018's language according to its terms ... since, as many a curbstone philosopher has observed, everything is related to everything else. Rather, in determining whether state oil-spill prevention laws 'respect' or 'relate to' the 'discharge of oil,' we must look to the objectives of OPA 90. Because one of the explicit objectives of OPA 90 is oil-spill prevention, § 1018 prevents anything in OPA 90 from preempting state laws in this field.") (citations and internal quotation marks omitted).
 
 
 24
 Contextual clues suggest, however, that Title I's preemption clauses do not apply to Title IV's prevention provisions. See Duffield v. Robertson Stephens & Co., 144 F.3d 1182, 1198 (9th Cir.1998) ("the meaning of statutory language, plain or not, depends on context") (citation and internal quotation marks omitted), cert. denied, 1998 WL 467389 (U.S. Nov.9, 1998) (No. 98-237). First, Congress placed these preemption clauses in a Title that addresses only liability and compensation for oil spills that actually occur. That placement (especially considering the full wording of the clauses) suggests that Congress intended for the clauses to apply only to the provisions in that Title. A second contextual clue strengthens that inference: A separate section in Title IV contains its own preemption clause. See § 4202(c) (Title IV), codified at 33 U.S.C. § 1321(o)(2).[2] Moreover, sections in other Titles of OPA 90 include their own preemption provisions as well. See § 5002(n) (Title V), codified at 33 U.S.C. § 2732;[3] § 8202 (Title VIII), codified at 43 U.S.C. § 1656(e).[4] There would have been little or no need for additional preemption clauses if the clauses in Title I were comprehensive. Indeed, the opinion's broad reading of the preemption clauses in § 1018 would render the other OPA 90 preemption provisions largely superfluous, a result that this court generally avoids. See Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 834 (9th Cir.1996) ("We have long followed the principle that statutes should not be construed to make surplusage of any provision.") (citation and internal quotation marks omitted).
 
 
 25
 Context, however, does not resolve the textual ambiguity definitively. In the face of an ambiguity not resolved by examining text and context, this court generally turns to a statute's legislative history. See Auburn v. United States, 154 F.3d 1025, 1029 (9th Cir.1998), as amended 1998 WL 727476, at * 3 (9th Cir.1998) (in construing a federal statute's preemptive effect, noting the general principle that resort to legislative history is appropriate when Congress' intent is not clear from an examination of the statutory text). See also Moyle v. Director, Office of Workers' Compensation Programs, 147 F.3d 1116, 1120 (9th Cir.1998) ("[I]f the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation.") (citation and internal quotation marks omitted). Here, the legislative history is of value.
 
 
 26
 OPA 90's preemption clauses originated in the Senate's Oil Pollution Liability and Compensation Bill of 1989.[5] The Senate intended for that bill to "consolidate and improve Federal laws providing compensation and establishing liability for oil spills." S.Rep. No. 101-94, at 1 (1989), reprinted in 1990 U.S.C.C.A.N. 722, 723. That bill did not include Title IV's oil pollution prevention provisions at all. See 135 Cong. Rec. S3241-46 (daily ed. Apr. 4, 1989).
 
 
 27
 The Senate drafted a separate bill, the Oil Tanker Navigation Safety Bill of 1989, that included provisions regarding the prevention of oil spills, including some provisions similar to those that eventually appeared in Title IV. See S.Rep. No. 101-99, 3-4 (1989), reprinted in 1990 U.S.C.C.A.N. 752.[6] That bill contained its own preemption clause. See 135 Cong. Rec. S9332 (daily ed. Aug. 2, 1989).[7] See also S.Rep. No. 101-99, at 21, reprinted in 1990 U.S.C.C.A.N. at 770.
 
 
 28
 The Senate added some of the preventive provisions from the Oil Tanker Navigation Safety Bill to the Oil Pollution Liability and Compensation Bill. See 135 Cong. Rec. S9678 (daily ed. Aug. 3, 1989); 135 Cong. Rec. S10406-07 (daily ed. Aug. 15, 1989). Specifically, the Senate added the provisions relating to alcohol testing and crew placement, which it put in Title III. See 135 Cong. Rec. S10406. The Senate also added the preemption clause from the Oil Tanker Navigation Safety Bill to that Title (§ 310), and it limited the reach of the preemption clause to the oil spill prevention provisions in that Title. See id. at S10415-S10417.[8] That modified bill did not alter the Oil Pollution Liability and Compensation Bill's preexisting preemption clauses found in the oil spill liability and compensation title of the amended bill (Title I, Section 106). Id. at S10412.
 
 
 29
 Although the Senate's final bill contained some oil spill prevention measures, Title IV originated in the House of Representatives in the Oil Pollution, Prevention, Response, Liability and Compensation Bill of 1989. In drafting that bill, the House generally chose to preempt, rather than to allow, state regulation. See Congressional Quarterly Almanac, 102d Cong., 2d Sess., p. 283 (1990) (noting the "House's insistence on a provision to pre-empt strict state laws"). Specifically, the House's preemption provision allowed states only to establish or maintain an oil spill fund and "to impose, or to determine the amount of, any fine or penalty." See Cong. Rec., 101st Cong., Vol. 135, part 20, 27827, 27947 (bound ed. Nov. 8, 1989).[9]
 
 
 30
 After vigorous debate, the House eventually amended its preemption provisions and adopted wording similar to that found in the Senate's § 106 preemption clauses.[10] See 135 Cong. Rec. H8165 (daily ed. Nov. 8, 1989). However, the debate made clear that the House intended for the preemption clauses to apply only to OPA 90's oil spill liability and compensation provisions. Compare id. at H8129 (Nov. 8, 1989) (statement of Rep. Miller) ("The amendment that I am offering on behalf of myself and the gentleman from Massachusetts [Mr. Studds] is an amendment to correct a glaring flaw in H.R. 1465, by preserving the rights of States to set higher standards for oil pollution liability and more complete systems of compensation than are allowed under this bill or under current law.") (emphasis added) with id. (statement of Rep. Hammerschmidt) ("I had thought that the issue of concern centered around whether State liability laws should be preempted. That is not the only issue presented by this amendment. This amendment goes much further. It would remove provisions in the bill addressing the need for a uniform system of financial responsibility. The system of liability and compensation in the bill is intended to be comprehensive and definite.") (emphasis added).
 
 
 31
 In summary, before Congress held its Conference Committee, the Senate had a bill with: (a) a preemption clause in its oil pollution liability and compensation title (Title I, § 106); and (b) some oil spill prevention provisions in Title III, which had their own specific preemption provision (§ 310). The House, where most of Title IV originated, had only one preemption provision (§ 1018), which was similar to the Senate's § 106 and which the House intended to apply only to oil spill liability and compensation.
 
 
 32
 The Conference Committee deleted the Senate's § 310 preemption clause that applied to oil spill prevention measures. Moreover, the Conference Committee relied only on the Senate's § 106 and the House's § 1018 when drafting the final preemption clauses. See H.R. Conf. Rep. No. 101-653, pp. 121-22 (1989), reprinted in 1990 U.S.C.C.A.N. 722, 799-800 ("Section 106 of the Senate amendment and section 1018 of the House bill are generally similar provisions.... The Conference substitute blends the provisions of the House and Senate bills, and adds a new subsection (d) pertaining to the liability of Federal employees.").[11] The Conference Committee's deletion of the only preemption clause that applied specifically to oil spill prevention, and its reliance instead on two provisions that never applied to prevention provisions, together suggest that Congress did not intend its final version of § 1018 to apply to OPA 90's oil spill prevention provisions (Title IV).
 
 
 33
 Under all the circumstances, Congress' choice of wording and its decision to place the preemption clauses in Title I suggest that it intended for those clauses to apply only to Title I and its liability and compensation provisions. See, e.g., National Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atlantic Corp., 924 F.Supp. 1436, 1448 (E.D.Va.1996) ("The purpose behind the savings clause is to allow the states to impose liability upon oil polluters above the liability imposed through OPA. Congress wanted to give the states the power to force polluters to cleanup completely oil spills and to compensate the victims of oil spills, even if their liability for these remediation expenses is limited under OPA."), aff'd, 122 F.3d 1062 (4th Cir.1997) (Table), cert. denied, --- U.S. ----, 118 S.Ct. 1301, 140 L.Ed.2d 467 (1998). The opinion's method of analyzing Congress' intent is incomplete and, thus, the opinion's conclusion fails accurately to identify that intent.
 
 PREEMPTIVE EFFECT OF COAST GUARD REGULATIONS
 
 34
 Relying on Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Intertanko opinion refuses to give preemptive effect to various Coast Guard regulations, because (1) Congress did not expressly delegate to the Coast Guard the power to preempt state law, and (2) OPA 90's preemption clauses implied the opposite Congressional intent. See Intertanko, 148 F.3d at 1068 ("Congress did not explicitly or impliedly delegate to the Coast Guard the authority to preempt state law. Indeed, § 1018 of OPA 90 establishes that nothing in OPA 90 may be construed as impairing the ability of the states to impose their own oil-spill prevention requirements. In view of Congress's unwillingness to preempt state oil-spill prevention efforts on its own, we find implausible the argument that it intended to delegate power to the Coast Guard to do so.") (citations and footnote omitted) (emphasis added). That analysis is inconsistent with Ninth Circuit and Supreme Court precedent.
 
 
 35
 Generally, an administrative agency's regulations have preemptive effect whenever Congress has authorized the agency to enact such regulations, not merely when Congress expressly has authorized the agency to preempt state law. See City of New York v. FCC, 486 U.S. 57, 64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988) ("[A] pre-emptive regulation's force does not depend on express congressional authorization to displace state law. Instead, the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action. The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof.") (citation and internal quotation marks omitted); Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 154, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (making the same point).
 
 
 36
 Louisiana Pub. Serv. Comm'n is not to the contrary. There, the Supreme Court refused to give preemptive effect to an administrative agency's regulations, because Congress had expressly denied the administrative agency the power to enact the regulations. See 47 U.S.C. § 152(b) ("[N]othing in this chapter shall be construed to apply to or give the Commission [FCC] jurisdiction with respect to ... intrastate communication service."); Louisiana Pub. Serv. Comm'n, 476 U.S. at 360, 106 S.Ct. 1890 ("[T]he Act grants to the FCC the authority to regulate interstate and foreign commerce in wire and radio communication, while expressly denying that agency jurisdiction with respect to ... intrastate communication service.") (citation and internal quotation marks omitted).
 
 
 37
 By contrast, OPA 90 did not deny the Coast Guard power to enact the regulations at issue here. Rather, Congress "required the Coast Guard to implement a wide range of oil-spill prevention rules" when it passed OPA 90. Intertanko, 148 F.3d at 1068 (emphasis added). See 33 U.S.C. §§ 2701-18 (so providing). Because the Coast Guard acted within its authority when it enacted the regulations, those regulations can have preemptive effect, even though Congress did not expressly authorize the Coast Guard to preempt state law.
 
 
 38
 OPA 90's preemption clauses, allowing for some state involvement, do not alter that analysis. In Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483 (9th Cir.1984), this court similarly faced a Congressional statute that allowed state involvement. Id. at 489 ("The above authorities demonstrate a congressional intent that there be joint federal/state regulation of ocean waters within three miles of shore."). Even though Congress had allowed state involvement, this court still analyzed whether the Coast Guard's regulations preempted state law. See id. at 499 ("Although we conclude that the objectives of the Alaska statute do not conflict with those of the Coast Guard regulations ..., we must nevertheless determine whether the facts of this case as alleged or conceded by appellees reveal an irreconcilable conflict when the Alaska statute and Coast Guard regulations are applied concurrently in Alaska territorial waters."). Accord Beveridge v. Lewis, 939 F.2d 859, 864 (9th Cir.1991). In summary, the opinion's treatment of the regulations is inconsistent with precedent.
 
 CONCLUSION
 
 39
 For the foregoing reasons, I dissent from the court's decision to decline the suggestion for a rehearing en banc.
 
 
 
 *
 The Honorable Alfredo C. Marquez, Senior Judge, United States District Court for the District of Arizona, sitting by designation
 
 
 [1]
 See also Sarah A. Loble, Intertanko v. Lowry: An Assessment of Concurrent State and Federal Regulation Over State Waters, 10 U.S.F. Mar. L.J. 27, 72 (1997) ("The Ninth Circuit has the opportunity to remedy the imbalance created by the district court, which favored Washington state regulation at the expense of federal interests."); Charles L. Coleman, III, Federal Preemption of State "BAP" Laws: Repelling State Borders in the Interest of Uniformity, 9 U.S.F. Mar. L.J. 305, 356 (1997) ("To the extent that the recent decision of the U.S. District Court for the Western District of Washington in Intertanko v. Lowry is inconsistent with the foregoing conclusions, it is wrong in this author's view, and should be overturned in the pending appeal to the Ninth Circuit Court of Appeals.") (footnote omitted); Robert E. Falvey, A Shot Across the Bow: Rhode Island's Oil Spill Pollution Prevention and Control Act, 2 Roger Williams U.L.Rev. 363, 396 (1997) ("The court attempted to counter Intertanko's preemption argument by simply asserting that Intertanko's theory was largely foreclosed by the nonpreemptive language of OPA '90. In light of the preceding discussion this reasoning seems unpersuasive.") (citation, footnote, and internal quotation marks omitted); Matthew P. Harrington, Necessary and Proper, but Still Unconstitutional: The Oil Pollution Act's Delegation of Admiralty Power to the States, 48 Case W. Res. L.Rev. 1, 17 n. 59 (1997) ("Congress seems to have had a somewhat more restrictive view of what was being preempted than did the district court in Intertanko. "); Michael P. Mullahy, States' Rights and the Oil Pollution Act of 1990: A Sea of Confusion?, 25 Hofstra L.Rev. 607, 636-37 (1996) ("The issue of whether Washington state has the power to enact the BAP Standards will most likely be decided by the Supreme Court.... [T]he Washington BAP Standards should survive the constitutional analysis the Court will most likely perform.") (footnote omitted); Laurie L. Crick, The Washington State BAP Standards: A Case Study in Aggressive Tanker Regulation, 27 J. Mar. L. & Com. 641, 646 (1996) ("[I]t is possible that most, if not all, of the BAP Standards will be upheld."); Marva Jo Wyatt, Navigating the Limits of State Spill Regulations: How Far Can They Go?, 8 U.S.F. Mar. L.J. 1, 26 (1995) ("The current controversy over Washington's navigational regulations affecting oil pollution implicates some of the most fundamental principles of our republic and foreshadows an age-old conflict between federalism and states' rights.")
 
 
 [2]
 In section 4202(c), OPA 90 amended 33 U.S.C. § 1321(o)(2), a preexisting provision of the Federal Water Pollution Control Act. The amendment is emphasized below
 Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State, or with respect to any removal activities related to such discharge.
 
 
 [3]
 Section 5002(n) provides in part:
 Nothing in this section shall be construed as modifying, repealing, superseding, or preempting any municipal, State or Federal law or regulation, or in any way affecting litigation arising from oil spills or the rights and responsibilities of the United States or the State of Alaska, or municipalities thereof, to preserve and protect the environment through regulation of land, air, and water uses, of safety, and of related development.
 
 
 [4]
 Section 8202(e) provides:
 (1) Nothing in this section shall be construed or interpreted as preempting any State or political subdivision thereof from imposing any additional liability or requirements with respect to the discharge, or threat of discharge, of oil or other pollution by oil.
 (2) Nothing in this section shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to discharges of oil.
 
 
 [5]
 The original draft provided:
 (a) Nothing in this Act shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the discharge of oil or other pollution by oil within such State. Nothing in this Act shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to discharges of oil.
 (b) Nothing in this Act or in section 9507 of the Internal Revenue Code of 1954 shall in any way affect, or be construed to affect, the authority of any State--
 (1) to establish, or to continue in effect, a fund any purpose of which is to pay for costs or damages arising out of, or directly resulting from, oil pollution or the substantial threat of oil pollution; or
 (2) to require any person to contribute to such a fund.
 (c) A State may enforce, on the navigable waters of such State, the requirements for evidence of financial responsibility applicable under section 104 of this Act.
 (d) The President shall consult with the affected State or States on the appropriate removal action to be taken. Removal with respect to any discharge or incident shall be considered completed when so determined by the President and the Governor or Governors of the affected State or States.
 (e) Nothing in this Act, the Act of March 3, 1851, as amended (46 U.S.C. 183 et seq.), or section 9507 of the Internal Revenue Code of 1954, shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof--
 (1) to impose additional liability or additional requirements; or
 (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law,
 relating to the discharge, or substantial threat of a discharge, of oil.
 
 
 [135]
 Cong. Rec. S3245 (daily ed. Apr. 4, 1989)
 
 
 [6]
 Specifically, Title III of that bill included provisions requiring (a) alcohol testing of tanker personnel and (b) the placement of four crew members on the navigation bridge of a tanker. Id
 
 
 [7]
 That clause provided:
 Nothing in this Act shall be construed or interpreted as changing, diminishing, or preempting in any way the authority of a State, or any political subdivision thereof, to regulate oil tankers or to provide for oil spill liability or contingency response planning and activities in State waters.
 
 
 [8]
 Section 310 provided:
 Nothing in this title shall be construed or interpreted as changing, diminishing, or preempting in any way the authority of a State, or any political subdivision thereof, to regulate oil tankers in State waters.
 Id. at S10417.
 
 
 [9]
 Section 1018 of the House version provided:
 (a) PREEMPTION
 (1) ACTIONS PREEMPTED.--Except as provided in this Act and the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.), no action arising out of a discharge of oil, or a substantial threat of a discharge of oil, from a vessel or facility into or upon the navigable waters or adjoining shorelines or the exclusive economic zone (other than an action for personal injury or wrongful death), may be brought in any court of the United States or of any State or political subdivision thereof.
 (2) STATE FUNDS AND ACCOUNTS.--Nothing in this Act or in sections 4611 and 9509 of the Internal Revenue Code of 1986 shall affect the authority of any State (A) to establish or continue in effect an oil spill fund or account; or (B) to require any person to contribute to that fund or account.
 (b) NO PREEMPTION OF PENALTIES.--Nothing in this Act or section 9509 of the Internal Revenue Code of 1986 shall affect the authority of the United States or any State or political subdivision thereof to impose, or to determine the amount of, any fine or penalty for any violation of law relating to an incident.
 (c) LIMITATION OF LIABILITY ACT.--The Act of March 3, 1851, shall not apply to removal costs and damages that directly result from an incident involving the discharge or substantial threat of discharge of oil.
 
 
 [10]
 The amended House version of § 1018 provides in part:
 (a) PRESERVATION OF STATE AUTHORITIES.--
 (1) Notwithstanding any other provision, nothing in this Act or the Act of March 3, 1851 shall--
 (A) be construed or interpreted as preempting any state or political subdivision thereof from imposing any additional liability or requirements with respect to the discharge of oil or other pollution by oil within such state; or
 (B) affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or state law, including common law.
 (2) Nothing in this Act or in sections 4611 or 9509 of the Internal Revenue Code of 1986 shall affect or be construed to affect the authority of any state or political subdivision thereof--
 (A) to establish or to continue in effect a fund any purpose of which is to pay for costs or damages arising out of, or directly resulting from, oil pollution or the substantial threat of oil pollution; or
 (B) to require any person to contribute to such a fund.
 
 
 [135]
 Cong. Rec. 156 H8128-29 (daily ed. Nov. 8, 1989)
 
 
 [11]
 The Conference Committee also indicated its intent "not to disturb the Supreme Court's decision in Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978)." Id